GREGORY, Chief Judge:
I.
A.
*234 *235 *236 *245 *246 *247 *248 *249 *250 On January 27, 2017-seven days after taking the oath of office-President Donald J. Trump signed Executive Order 13,769, " Protecting the Nation From Foreign Terrorist Entry Into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017). Invoking his authority under 8 U.S.C. § 1182(f), President Trump immediately suspended for ninety days the immigrant and nonimmigrant entry of foreign aliens from seven predominantly Muslim countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. Int'l Refugee Assistance Project (IRAP) v. Trump , 265 F.Supp.3d 570, 586 (D. Md. 2017). The President's national security officials were taken by surprise by EO-1. See J.A. 172-74 (describing confusion in the cabinet after EO-1); 455 (declaration of Former National Security Officials, stating that EO-1 did not undergo the usual deliberative process); 786 (statements of Acting Attorney General Sally Yates, explaining that she was deliberately not consulted prior to EO-1).
Immediately before signing EO-1, President Trump remarked that it was "the 'Protection of the Nation from Terrorist Entry into the United States.' We all know what that means." IRAP v. Trump , 265 F.Supp.3d at 586. Just after signing, President Trump stated in an interview with the Christian Broadcasting Network that EO-1 would give preference to Christian refugees. Referring to Syria, President Trump stated that "[i]f you were a Muslim you could come in, but if you were a Christian, *251 it was almost impossible.... And I thought it was very, very unfair." J.A. 250. One day after he issued EO-1, President Trump told reporters that implementation of EO-1 is "working out very nicely and we're going to have a very, very strict ban." J.A. 173. That same day, former New York Mayor Rudy Giuliani, an advisor to the President, stated that President Trump told him that he wanted a "Muslim ban" and requested that Giuliani assemble a commission to show him "the right way to do it legally." J.A. 297.
Individuals, organizations, and states across the nation challenged EO-1 in federal court, and two federal courts issued injunctions enjoining the enforcement of EO-1. See Washington v. Trump , No. 17-141, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017) ; Aziz v. Trump , 234 F.Supp.3d 724, 739 (E.D. Va. 2017). In response to these injunctions, then-White House Press Secretary Sean Spicer maintained that EO-1 was lawful but promised a new order would issue soon. J.A. 127. Senior Policy Advisor Stephen Miller stated that the new order would be "responsive" to recent court rulings, but described the changes as "mostly minor technical differences" that would not invalidate the "basic policy outcome" of EO-1. J.A. 128.
On March 6, 2017, President Trump issued Executive Order 13,780, which was given the same title as EO-1 and was scheduled to take effect on March 16, 2017. 82 Fed. Reg. 13,209 (Mar. 6, 2017) ("EO-2"). EO-2 revoked EO-1 but nevertheless bore many similarities to its predecessor. Invoking both 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a), President Trump re-imposed the same ninety-day ban on entry into the United States for nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen but removed Iraq from the list. Id. at 13,210 -12. Like its predecessor, EO-2 directed various government officials to conduct a worldwide review during the 90-day suspension period to determine whether foreign governments were providing adequate information about their nationals seeking entry into the United States. Id. The Secretary of Homeland Security was to report these findings to the President, and nations identified as providing inadequate information were to be given an opportunity to improve their practices. At the conclusion of this review, the Secretary of Homeland Security was to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested." Id.
Like its predecessor, EO-2 was soon challenged in multiple courts and preliminarily enjoined. See Hawai'i v. Trump , 245 F.Supp.3d 1227, 1239 (D. Haw. 2017) ; IRAP v. Trump , 241 F.Supp.3d at 566. This Court (sitting en banc) and the Ninth Circuit both affirmed the injunctions on appeal. IRAP v. Trump , 857 F.3d 554 (4th Cir. 2017) (hereinafter " IRAP I ") (en banc); Hawai'i v. Trump , 859 F.3d 741 (9th Cir. 2017) (per curiam). The Supreme Court granted a writ of certiorari in both cases and left the injunctions in place pending its review except as to foreign nationals who lacked a "credible claim of a bona fide relationship with a person or entity in the United States." Trump v. IRAP , --- U.S. ----, ----, 137 S.Ct. 2080, 2088, 198 L.Ed.2d 643 (2017).
B.
On September 24, 2017, President Trump issued Proclamation No. 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats (the "Proclamation"), 82 Fed. Reg. 45,161 (Sept. 24, 2017). Invoking *252 both 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a), the Proclamation succeeds EO-2 and indefinitely suspends the entry of some or all immigrants and nonimmigrants from eight countries: Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen (the "Designated Countries"). Id. at 45,165 -67. Six of these countries-Chad, Libya, Iran, Somalia, Syria, and Yemen-are majority-Muslim and have a combined population of approximately 150 million people. J.A. 234-48, 852-59.
The Proclamation indicated that the worldwide review ordered by EO-2 was complete and recited some of the review's processes and results. 82 Fed. Reg. at 45,162. The Government did not make the report part of the record for the Court's review, and it conceded during oral argument that the validity of the Proclamation rises or falls on the rationale presented within its four corners. Oral Arg. 32:30-33:00.
As part of the review, the Secretary of Homeland Security reportedly created a "baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States" or other benefits under the immigration laws and "to assess whether they are a security or public-safety threat." 82 Fed. Reg. at 45,162. Three categories of baseline criteria were used to determine the quality of a country's information sharing and are listed in § 1 of the Proclamation. Id. at 45,162 -63.
The first category involves "identity-management information," which the Proclamation states is "needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be." Id. at 45,162. Criteria in this category "include whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports." Id.
The second category involves "national security and public-safety information," which the Proclamation states is needed to determine whether "persons who seek entry to this country pose national security or public-safety risks." Id. Criteria include "whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States." Id.
The third category involves a "national security and public-safety assessment." Id. at 45,162 -63. This category consists of various national security risk indicators, including "whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program ... that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States." Id.
Applying these baseline criteria, the Department of Homeland Security identified sixteen countries as "inadequate." Id. at 45,163. Thirty-one additional countries were classified as "at risk" of becoming inadequate. Id. Then followed a fifty-day engagement period during which all countries, including those not identified as "inadequate" or "at-risk," were encouraged to improve their information-sharing practices. Id.
Ultimately, the Secretary of Homeland Security recommended eight countries for *253 entry restrictions, recommendations that President Trump adopted in full. The Secretary determined that Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen continued to be "inadequate" and recommended that nationals from these countries be subjected to entry restrictions. Id. Somalia did meet the baseline criteria but was nonetheless added to the list of countries subject to entry restrictions under the Proclamation because its "government's inability to effectively and consistently cooperate, combined with the terrorist threat that emanates from its territory, present special circumstances that warrant restrictions and limitations on the entry of its nationals into the United States." Id. at 45,164 -65, 45,167. Iraq did not meet the baseline criteria but was exempted from entry suspensions in light of "the close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS)." Id. at 45,163. Instead, Iraqi nationals will face "additional scrutiny." Id. The Proclamation does not indicate whether any other countries that also failed the baseline were nonetheless not recommended for entry restrictions.
The Proclamation imposes different restrictions on immigrants and nonimmigrants from the eight countries, but all restrictions are indefinite. Id. at 45,164, 45,169. The Proclamation suspends immigration from Chad, Iran, Libya, North Korea, Somalia, Syria, and Yemen; it exempts Venezuela, which failed the baseline criteria, but includes Somalia, which passed. Id. at 45,165 -67. The Proclamation also restricts some or all categories of nonimmigrants from all countries except Somalia, whose nationals will instead undergo additional scrutiny. Id. Specifically, it bars the issuance of all nonimmigrant visas to Syrian and North Korean nationals; of all nonimmigrant visas except F, M, and J visas to Iranian nationals; and of B-1, B-2, and B-1/B-2 visas to Libyan, Yemeni, and Chadian nationals. Id. But because the Government has "alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela," the Proclamation only suspends B-1, B-2, and B-1/B-2 visas for "government officials ... who are responsible for the identified inadequacies." Id. at 45,166.
The Proclamation only applies to foreign nationals who are outside the United States on the effective date and "do not have a valid visa" or "qualify for a visa or other valid travel document." Id. at 45,167. The Proclamation does allow for waivers, but they are discretionary and require the foreign national to prove that denying entry would cause "undue hardship," that entry would "not pose a threat to the national security or public safety of the United States," and that entry "would be in the national interest." Id. at 45,168. The Proclamation does not allow any categorical exemptions, even for the immediate relatives of American citizens. Id. at 45,168 -69.
The entry restrictions were effective immediately for foreign nationals who 1) were subject to EO-2's restrictions and 2) lack a credible claim of a bona fide relationship with a person or entity in the United States. Id. at 45,171. For all other affected persons, the Proclamation was scheduled to take effect on October 18, 2017. Id.
C.
As with EO-1 and EO-2, the Proclamation faced swift legal challenge within this circuit and in the Ninth Circuit.
*254 Three separate lawsuits were brought or amended in the District Court for the District of Maryland and are now consolidated before us on appeal. One challenge was brought by the International Refugee Assistance Project (IRAP), HIAS, Inc., Middle East Studies Association (MESA), Arab-American Association of New York (AAANY), Yemeni-American Merchants Association (YAMA), John Doe Nos. 1 and 3-5, Jane Doe No. 2, Muhammed Meteab, Mohamad Mashta, Grannaz Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, and Afsaneh Khazaeli (collectively, the "IRAP Plaintiffs"). A second was brought by the Iranian Alliances Across Borders (IAAB), the Iranian Students' Foundation (ISF), and Doe Nos. 1-6 (collectively, the "IAAB Plaintiffs"). And a third was brought by Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe No. 1, and Jane Doe Nos. 2-3 (collectively, the "Zakzok Plaintiffs").[1]
The three cases assert that the Proclamation and EO-2 violate some or all of the INA, the Establishment Clause of the First Amendment, the Free Speech and Free Association Clauses of the First Amendment, the equal protection and procedural due process components of the Due Process Clause of the Fifth Amendment, the Religious Freedom Restoration Act, the Refugee Act, and the Administrative Procedure Act (APA).
The twenty-three individual Plaintiffs are all U.S. citizens or lawful permanent residents, and most of them have close family members who are nationals of the Designated Countries and who are in the process of applying for immigrant and nonimmigrant visas to the United States. Most of the individual Plaintiffs are also members of the Muslim faith, whether practicing or non-practicing. Three organizational Plaintiffs (IRAP, HIAS, and AAANY) "primarily provide services to clients," who are primarily either refugees or members of the Arab-American and Arab immigrant community. IRAP v. Trump , 265 F.Supp.3d at 594. The remaining organizational Plaintiffs (MESA, YAMA, IAAB, and ISF) "convene events on issues relating to the Middle East or advocate on behalf of their members." Id. All Plaintiffs seek injunctive and declaratory relief.
Each of these three separate cases names some or all of the following as Defendants: President Trump in his official capacity; the U.S. Department of Homeland Security (DHS) and Kirstjen M. Nielsen in her official capacity as Secretary of Homeland Security; the U.S. Department of State and Rex W. Tillerson in his official capacity as Secretary of State; the Office of the Director of National Intelligence (ODNI) and Dan Coats in his official capacity as Director of National Intelligence; Jefferson Beauregard Sessions, III in his official capacity as Attorney General; Kevin K. McAleenan in his official capacity as Acting Commissioner of the U.S. Customs and Border Protection; and L. Francis Cissna in his official capacity as Director of U.S. Citizenship and Immigration Services.
Plaintiffs moved to preliminarily enjoin the Proclamation in its entirety before it took effect. They claimed that the Proclamation violated the Establishment Clause's *255 prohibition on disfavoring religion, exceeded the President's authority under 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a)(1), violated 8 U.S.C. § 1152(a) 's prohibition on nationality discrimination in the issuance of visas, and failed to comply with § 1182(f) 's procedural requirements.[2] On October 17, 2017, the district court granted a preliminary injunction against enforcement of the Proclamation's entry restrictions, subject to certain exceptions. IRAP v. Trump , 265 F.Supp.3d at 633. The district court held that Plaintiffs were likely to succeed on the merits of their § 1152(a) claim and their Establishment Clause claim but not on the merits of their § 1182(f) and § 1185(a)(1) claims. The district court conformed the injunction to the terms of the Supreme Court's June 2017 stay, limiting it to individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States." Id. at 631 (citing Trump , 137 S.Ct. at 2088 ). But the court declined to enjoin the Proclamation as to travelers from Venezuela or North Korea because the balance of equities favors the Government. That same day, the U.S. District Court for the District of Hawai'I also enjoined the Proclamation, concluding that it likely violated § 1182(f) and § 1152(a)(1). Hawai'i v. Trump , 265 F.Supp.3d 1140, 1160-61 (D. Haw. 2017).
On December 4, 2017, the Supreme Court granted the Government's request for a complete stay pending appellate review of the two district courts' preliminary injunctions. Trump v. IRAP , 138 S.Ct. 542, 542 (2017) (mem.). In light of the stay, the relevant agencies have fully implemented the entry restrictions laid out in the Proclamation as of December 8, 2017.[3] Dep't of State, New Court Order on Presidential Proclamation (Dec. 4, 2017) (saved as ECF opinion attachment 1) (hereinafter "State Department Statement") ("Per the Supreme Court's orders, those restrictions will be implemented fully, in accordance with the Presidential Proclamation, around the world, beginning December 8 at open of business, local time."); see also DHS, Fact Sheet: The President's Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats (Sept. 24, 2017) (saved as ECF opinion attachment 2) (hereinafter "DHS Fact Sheet").
On December 22, 2017, the Ninth Circuit affirmed the district court, concluding that the Proclamation likely exceeded the scope of the President's authority under § 1182(f), failed to comply with § 1182(f) 's procedural prerequisites, and violated § 1152(a)(1) 's prohibition on nationality-based discrimination. Hawai'i v. Trump , 878 F.3d 662, 673 (9th Cir. 2017). The Government filed for a writ of certiorari on January 5, 2018, which the Supreme Court granted on January 19, 2018. Trump v. Hawai'i , No. 17-965, --- U.S. ----, 138 S.Ct. 923, --- L.Ed.2d ----, 2018 WL 324357, at *1 (U.S. Jan. 19, 2018).
II.
We evaluate a district court's decision to grant a preliminary injunction *256 under an abuse-of-discretion standard. Aggarao v. MOL Ship Mgmt. Co. , 675 F.3d 355, 366 (4th Cir. 2012). Under this standard, we review the district court's factual findings for clear error and review its legal conclusions de novo. Dewhurst v. Century Aluminum Co. , 649 F.3d 287, 290 (4th Cir. 2011).
A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to relief." Di Biase v. SPX Corp. , 872 F.3d 224, 230 (4th Cir. 2017) (quoting Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ). The plaintiff "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Id. (internal quotation marks and citation omitted). A plaintiff seeking a preliminary injunction must establish that (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public interest. WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave , 553 F.3d 292, 298 (4th Cir. 2009) (citing Winter , 555 U.S. at 7, 129 S.Ct. 365 ).
We turn first to the Plaintiffs' likelihood of success on the merits.
III.[4]
"The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." Epperson v. Arkansas , 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ; accord Larson v. Valente , 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (holding that Establishment Clause prohibits "one religious denomination [from being] officially preferred over another."). "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." McCreary Cty. v. ACLU, 545 U.S. 844, 860, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). "[T]he Establishment Clause forbids subtle departures from neutrality, 'religious gerrymanders,' as well as obvious abuses." Gillette v. United States , 401 U.S. 437, 452, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (quoting Walz v. Tax Comm'n , 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ). Similarly, "any covert suppression of particular religious beliefs" is unconstitutional. See Bowen v. Roy , 476 U.S. 693, 703, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (plurality opinion).
The Plaintiffs allege that the Proclamation violates the Establishment Clause by disfavoring Muslims. We begin by considering (and rejecting) the Government's challenges to the justiciability of Plaintiffs' claim. We then turn to Plaintiffs' likelihood of succeeding on the merits. We find that Plaintiffs have met their high burden of demonstrating that the Proclamation's purported purpose is not "bona fide" under Mandel and therefore proceed to determine whether the Proclamation has a primarily secular purpose. Examining official statements from President Trump and other *257 executive branch officials, along with the Proclamation itself, we conclude that the Proclamation is unconstitutionally tainted with animus toward Islam.
A.
"Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so." Renne v. Geary , 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). The Government raises two challenges to the justiciability of Plaintiffs' Establishment Clause claim: first, Plaintiffs lack standing under Article III, and second, Plaintiffs' claim is not ripe.[5] As we explain below, we reject both arguments and find Plaintiffs' Establishment Clause claim justiciable.
1.
First, the Government claims that Plaintiffs have not properly alleged an injury-in-fact sufficient to satisfy Article III's standing requirement. We disagree. For many of the same reasons as in IRAP I , we find that many of the individual Plaintiffs and two of the organizational Plaintiffs have standing because they have sufficiently alleged personal contact with unconstitutional religious animus. See 857 F.3d at 582-86.
Article III of the Constitution gives this Court jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, sec. 2, cl. 1. One element of a "case" or "controversy" is that the plaintiff have standing-that is, "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." Massachusetts v. EPA , 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (quoting Baker v. Carr , 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ). The Supreme Court has articulated three requirements that together are the "irreducible constitutional minimum of standing." Lujan v. Defs. of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The plaintiff "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."
*258 Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc. , 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan , 504 U.S. at 560-61, 112 S.Ct. 2130 ); accord Spokeo, Inc. v. Robins , --- U.S. ----, 136 S.Ct. 1540, 1547-48, 194 L.Ed.2d 635 (2016). An organization has associational standing to sue "on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Laidlaw , 528 U.S. at 180-81, 120 S.Ct. 693.
We review de novo the district court's finding of standing. Peterson v. Nat'l Telecomms. & Info. Admin. , 478 F.3d 626, 631 n.2 (4th Cir. 2007). Plaintiffs must have standing for every claim. Bostic v. Schaefer , 760 F.3d 352, 370 (4th Cir. 2014) (citing DaimlerChrysler Corp. v. Cuno , 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ). They also must have standing for every form of relief. Laidlaw , 528 U.S. at 185, 120 S.Ct. 693. But the "Supreme Court has made it clear that 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.' " Bostic , 760 F.3d at 370-71 (quoting Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc. , 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) ). And the same injury can provide Plaintiffs with standing for multiple claims. E.g. , id. at 371-72 (finding same injury provided standing for both Due Process and Equal Protection claims).
When evaluating standing, we "must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." Cooksey v. Futrell , 721 F.3d 226, 239 (4th Cir. 2013) (quoting City of Waukesha v. EPA , 320 F.3d 228, 235 (D.C. Cir. 2003) ); see also Meese v. Keene , 481 U.S. 465, 473, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). Plaintiffs here have alleged that the Proclamation violates the Establishment Clause, which bars government action that establishes or disfavors religion. U.S. Const. amend. I ; Everson v. Bd. of Educ. , 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Thus, we must assume that the Proclamation does harbor unconstitutional animus against Islam.
The "concept of injury for standing purposes is particularly elusive in Establishment Clause cases." Suhre v. Haywood Cty. , 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting Murray v. City of Austin , 947 F.2d 147, 151 (5th Cir. 1991) ). Unlike Free Exercise Clause claims, Establishment Clause claims do not require "proof that particular religious freedoms are infringed." Sch. Dist. of Abington Twp. v. Schempp , 374 U.S. 203, 224 n.9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (citing McGowan v. Maryland , 366 U.S. 420, 429-30, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ). Instead, Establishment Clause injuries are often "spiritual and value-laden, rather than tangible and economic." Moss v. Spartanburg Cty. Sch. Dist. Seven , 683 F.3d 599, 607 (4th Cir. 2012) (internal quotation marks and citation omitted).
As a result, Establishment Clause injury-in-fact "may be shown in various ways," Ariz. Christian Sch. Tuition Org. v. Winn , 563 U.S. 125, 129, 131 S.Ct. 1436, 179 L.Ed.2d 523 (2011), including through "noneconomic or intangible injury," Suhre , 131 F.3d at 1086. For example, "[f]eelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a *259 particular religion 'that they are outsiders, not full members of the political community.' " Moss , 683 F.3d at 607 (quoting McCreary, 545 U.S. at 860, 125 S.Ct. 2722 ). A plaintiff can also suffer cognizable injury from: paying money damages to the government, McGowan , 366 U.S. at 424-25, 81 S.Ct. 1101 ; having one's employees pay money damages to the government, Two Guys From Harrison-Allentown, Inc. v. McGinley , 366 U.S. 582, 592, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961) ; receiving a letter that promotes a religious education course, Moss , 683 F.3d at 607 ; paying taxes, when Congress enacts legislation pursuant to its taxing and spending powers, Flast v. Cohen , 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ; changing one's behavior or assuming special burdens, Suhre , 131 F.3d at 1088-89 ; participating in state-mandated religious exercises, such as school prayer, Schempp , 374 U.S. at 224-26 & n.9, 83 S.Ct. 1560 ; being exposed to state-sponsored religious exercises, such as legislative prayer, Marsh v. Chambers , 463 U.S. 783, 786 n.4, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) ; experiencing employment discrimination, In re Navy Chaplaincy , 534 F.3d 756, 760 (D.C. Cir. 2008) ; and having personal contact with state-sponsored religious displays, Suhre , 131 F.3d at 1086. A cognizable injury need not rest on a single isolated fact but can instead arise from multiple related factors. See Moss , 683 F.3d at 607.
The common thread among these different forms of cognizable legal injury is "personal contact" with the alleged establishment or disfavoring of religion. Suhre , 131 F.3d at 1086. In other words, Establishment Clause injuries-like all injuries-in-fact-must be particularized: they "must affect the plaintiff in a personal and individual way." Spokeo , 136 S.Ct. at 1548. This is because a "mere abstract objection to unconstitutional conduct is not sufficient to confer standing." Suhre , 131 F.3d at 1086. Nor is a "firm[ ] commit[ment] to the constitutional principle of separation of church and State," Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc. , 454 U.S. 464, 486, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citation omitted), nor a general disagreement with government policy, Moss , 683 F.3d at 604. Instead, Plaintiffs must allege a "personal injury suffered by them as a consequence of the alleged constitutional error." Valley Forge , 454 U.S. at 485, 102 S.Ct. 752.[6]
The district court concluded that numerous individual Plaintiffs had "asserted specific, intangible injuries resulting from [their] personal contact with the alleged Establishment Clause violation." IRAP v. Trump , 265 F.Supp.3d at 600. We agree. The Plaintiffs have plausibly alleged that the Proclamation-which we must assume does unconstitutionally disfavor Islam, Cooksey , 721 F.3d at 239 -has caused many Plaintiffs to suffer two related personal injuries. First, they, as members of *260 the disfavored religion, are the "victims of this alleged religious intolerance" who are suffering "[f]eelings of marginalization and exclusion." Moss , 683 F.3d at 606-07 ; cf. id. (finding certain plaintiffs lacked standing because they were members of favored religion and so were "seeking to vindicate ... the rights of others"). Second, they are experiencing prolonged separation from close family members who have been rendered categorically ineligible for visas. See Bostic , 760 F.3d at 371-72 (finding same injury provided standing for two different claims). Because these are actual, concrete injuries that "affect the plaintiff[s] in a personal and individual way," Plaintiffs have suffered a cognizable injury-in-fact. Spokeo , 136 S.Ct. at 1548 (citation omitted); see Moss , 683 F.3d at 607 (locating cognizable injury-in-fact in several related facts).
For example, IRAP Plaintiff John Doe No. 5 is a Muslim and U.S. citizen of Yemeni origin who is sponsoring his mother, also Yemeni, in her application for an immigrant visa. J.A. 573-75. His uncle is sponsoring his grandmother, who has Alzheimer's disease. Id. "Since the ban," John Doe No. 5 has "heard anti-Islamic comments more frequently," and he or someone he knows experiences Islamophobia "[a]lmost every week." Id. He says that "in the days after the ban, a man came into my grocery store and said that I make this country worse, and that he was happy with the ban." Id. IRAP Plaintiff John Doe No. 4 is a non-practicing Muslim whose Iranian wife is seeking an immigrant visa to the United States. J.A. 587-89. He states that he felt "insulted" and "demeaned" by the travel restrictions because they "felt like collective punishment" and that the Proclamation "has made [him] feel this more strongly." Id. He also notes that since the first travel ban was issued in January 2017, he gets "more suspicious looks from people" and feels that he is "being labeled as a Muslim more often." Id. IAAB Plaintiff Doe No. 6 is an Iranian Muslim and lawful permanent resident whose mother-in-law's nonimmigrant visa application was recently denied pursuant to the Proclamation. J.A. 1174-76; Mot. Suppl. R. 2, Ex. A, Dec. 22, 2017, ECF No. 162. He states that he feels "personally attacked, targeted, and disparaged by this new Proclamation, which shows hostility to Iranians generally and to Muslims in particular." J.A. 1175. He feels "like an outsider in the country that I call my home" and fears for his safety and the safety of his loved ones. Id. Zakzok Plaintiff Fahed Muqbil is a U.S. citizen of Yemeni origin and a practicing Muslim who is sponsoring his wife, also Yemeni, for an immigrant visa. J.A. 1244-48. He states that the Proclamation makes him feel as if he and his fellow American Muslims "are unwanted, different, and somehow dangerous merely because of [their] religion." Id. He feels "condemned and penalized for practicing Islam" and treated "as a second class citizen simply because of [his] Islamic faith." Id.[7] These are personal, particularized injuries cognizable under Article III because they are suffered "as a consequence of the *261 alleged constitutional error." Valley Forge , 454 U.S. at 485, 102 S.Ct. 752.
The Government argues that the district court erred by conflating the "injury-in-fact from an alleged Establishment Clause violation with the question whether the violation was of the individual's own Establishment Clause rights." First Cross-Appeal Br. 27 (hereinafter "First Br.") (emphasis omitted). We disagree. A cognizable Establishment Clause injury need "not include proof that particular religious freedoms are infringed," Schempp , 374 U.S. at 225 n.9, 83 S.Ct. 1560, nor direct regulation or discrimination by the government. Article III standing in this context can arise from paying taxes, Flast , 392 U.S. at 106, 88 S.Ct. 1942 ; hearing legislative prayer as a member of that body, Marsh , 463 U.S. at 786 n.4, 103 S.Ct. 3330 ; or looking at a religious display, Suhre , 131 F.3d at 1086. Indeed, in Moss , we found standing based in part on simply receiving a letter promoting a religious education course. 683 F.3d at 607.[8]
Nor is this case similar to In re Navy Chaplaincy , in which the plaintiffs based their standing on hearing a " 'message' of religious preference." 534 F.3d at 759. There, the plaintiffs' expansive theory of message-based standing would have permitted "any recipient of the Navy's 'message,' " including "the judges on th[e] panel," to have standing to challenge the allegedly unconstitutional conduct. Id. at 764. But Plaintiffs do not claim standing solely because they heard about the Proclamation-mere awareness of religious animus, without more, is insufficient.
Instead, many of the individual Plaintiffs here have alleged a violation of their own Establishment Clause rights, and they have presented evidence that the violation is particular to them: they have articulated specific feelings of "marginalization and exclusion," Moss , 683 F.3d at 607, and they are facing prolonged separation from family members deemed categorically ineligible to enter the country.[9] Both injuries are caused by the Proclamation, which at this stage we must assume excludes Plaintiffs' relatives based on religious animus. Cooksey , 721 F.3d at 239. And both injuries can be remedied if the Proclamation is enjoined. Whether these Plaintiffs' relatives are issued visas and admitted to the country is beyond the scope of this litigation and ultimately not subject to judicial review. But a plaintiff need "not show that a favorable decision will relieve his every injury." Larson , 456 U.S. at 242-43 & n.15, 102 S.Ct. 1673 (holding that plaintiffs had standing to challenge one part of state law requiring registration under charitable solicitation statute, even if plaintiffs might ultimately be required to register for different reasons); accord Regents of Univ. of Cal. v. Bakke , 438 U.S. 265, 280 n.14, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Instead, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself," Larson , 456 U.S. at 242-43 & n.15, 102 S.Ct. 1673 -here, the discrete *262 expression of government animus against Islam and the prolonged (verging on permanent) separation of family members. Thus, the individual Plaintiffs have standing under Article III to bring their Establishment Clause claim.
For the same reasons, we adopt and affirm the district court's finding that MESA and YAMA have associational standing to assert an Establishment Clause claim on behalf of their members. IRAP v. Trump , 265 F.Supp.3d at 601. Both have identified at least one member who has suffered feelings of marginalization and exclusion in his community and who has a close family member actively seeking an immigrant visa. J.A. 556 (MESA), 612-13 (YAMA). The interests are "germane to the organization's purpose" and there is no reason the individual members must participate in the lawsuit. Laidlaw , 528 U.S. at 180-81, 120 S.Ct. 693 ; IRAP v. Trump , 265 F.Supp.3d at 601. Thus, MESA and YAMA have associational standing as to the Establishment Clause claim.
Unlike the plaintiffs in Valley Forge , Plaintiffs here have not "roam[ed] the country in search of governmental wrongdoing." 454 U.S. at 487, 102 S.Ct. 752. Instead, the purported government wrongdoing has found them. We conclude that many of the individual and two of the organizational Plaintiffs have standing to bring an Establishment Clause claim.
2.
Second, the Government argues that Plaintiffs' claim is not ripe until one of their relatives has been rejected for a visa and a waiver. During the pendency of this litigation, the mother-in-law of IAAB Plaintiff Doe No. 6 was denied both. Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645."). The Government's argument is therefore moot and by its own statements the claim of IAAB Plaintiff Doe No. 6 is ripe. First Br. 23 ("If any alien in whose entry a U.S. plaintiff has a cognizable interest is found otherwise eligible for a visa and denied a waiver, then that plaintiff can bring suit at that time[.]"). Nevertheless, we must also reject the Government's contention on the merits because it rests on a misapprehension of Plaintiffs' claim.
The doctrine of ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner , 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). "To determine if a case is ripe, we 'balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.' " Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC , 713 F.3d 187, 198 (4th Cir. 2013) (quoting Miller v. Brown , 462 F.3d 312, 319 (4th Cir. 2006) ). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." Miller , 462 F.3d at 319. And a case will cause hardship when it "create[s] adverse effects of a strictly legal kind." Ohio Forestry Ass'n, Inc. v. Sierra Club , 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). "When considering hardship, we may consider the cost to the parties of delaying judicial review." Miller , 462 F.3d at 319.
*263 Ripeness here comes from the "imposition of the barrier," not the ultimate denial of a visa or waiver. Gratz v. Bollinger , 539 U.S. 244, 262, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (finding that a student had standing to challenge a school's affirmative action program even though the student had not actually applied, much less been rejected). As of December 8, 2017, the relevant agencies have fully implemented the travel restrictions detailed in the Proclamation. State Department Statement, supra . Accordingly, Plaintiffs' family members are now categorically inadmissible unless they meet the high standard for a waiver. Id. The relief Plaintiffs seek is not the issuance of a visa or waiver to their relatives, which is subject to the many limitations established by Congress in the INA and to the discretion of consular officials. 8 U.S.C. §§ 1104(a)(1), 1201 ; 6 U.S.C. § 236(b)(1). Instead, Plaintiffs merely ask that their relatives go through the same individualized vetting process that the executive branch applies to nationals from all other countries-an individualized vetting process that has already been denied them.
Because the agencies have fully implemented the travel restrictions, the legality of those restrictions is "fit for judicial decision." Miller , 462 F.3d at 319.[10] The issues raised by Plaintiffs-including whether the Proclamation's travel restrictions violate the Constitution-are "purely legal." Id. And the agencies' implementation of these restrictions is certainly "final." Id. Therefore, the cost to the parties of delaying judicial review would be to functionally deprive them of any judicial review. Indeed, if we waited until all of Plaintiffs' family members were denied visas, the Government would surely argue that the claim is then moot because they cannot demonstrate that their relatives would apply again. We reject this circular interpretation of ripeness.
We conclude that Plaintiffs' claim is ripe for review.
B.
In assessing Plaintiffs' Establishment Clause challenge, we first ask whether the proffered reason for the Proclamation is "facially legitimate and bona fide." Kleindienst v. Mandel , 408 U.S. 753, 770, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) ; see IRAP I , 857 F.3d at 588-93. The Proclamation's stated purpose is "to protect [U.S.] citizens from terrorist attacks and other public-safety threats" and "to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems." 82 Fed. Reg. at 45,162.
The Mandel standard, read through the lens of Justice Kennedy's opinion in Kerry v. Din ,[11] imposes a heavy *264 burden on Plaintiffs, but not an insurmountable one. See --- U.S. ----, 135 S.Ct. 2128, 2139-41, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring in judgment). It clearly affords the political branches substantial deference. Yet it also accounts for those very rare instances in which a challenger plausibly alleges that a government action runs so contrary to the basic premises of our Constitution as to warrant more probing review. Plaintiffs argue that the Proclamation is one of those rare instances.
Assuming without deciding that the proffered purpose of the Proclamation is "facially legitimate," we turn to the question of whether it is "bona fide" as required by Mandel .[12] Justice Kennedy's concurrence in Din elaborated on this "bona fide" requirement. An action is not considered "bona fide" if Plaintiffs make an "affirmative showing of bad faith," which they must "plausibly allege[ ] with sufficient particularity." See id. at 2141 (Kennedy, J., concurring in the judgment); Mandel , 408 U.S. at 770, 92 S.Ct. 2576. Upon such a showing, a court may "look behind" the Government's proffered justification for its action. See Din , 135 S.Ct. at 2141 (Kennedy, J., concurring in the judgment); see also Marczak v. Greene , 971 F.2d 510, 516-18 (10th Cir. 1992). Therefore, to advance their First Amendment claim, Plaintiffs must have "plausibly alleged with sufficient particularity" that the Proclamation's invocation of national security is a pretext for an anti-Muslim religious purpose.
In the extraordinary case before us, resolution of that question presents little difficulty. Unlike Din and Mandel , in which the Government had a "bona fide factual basis" for its actions, Din , 135 S.Ct. at 2140 (Kennedy, J., concurring in the judgment), here the Government's proffered rationale for the Proclamation lies at odds with the statements of the President himself. Plaintiffs here do not just plausibly allege with particularity that the Proclamation's purpose is driven by anti-Muslim bias, they offer undisputed evidence of such bias: the words of the President. This evidence includes President Trump's disparaging comments and tweets regarding Muslims; his repeated proposals to ban Muslims from entering the United States; his subsequent explanation that he would effectuate this "Muslim" ban by targeting "territories" instead of Muslims directly; the issuance of EO-1 and EO-2, addressed only to majority-Muslim nations; and finally the issuance of the Proclamation, which not only closely tracks EO-1 and EO-2, but which President Trump and his advisors described as having the same goal as EO-1 and EO-2. See IRAP I , 857 F.3d at 591 ; see, e.g. , J.A. 168, 756, 779, 791, 794, 808-12, 815-17, 820.
The President's own words-publicly stating a constitutionally impermissible reason for the Proclamation-distinguish this case from those in which courts have found that the Government had satisfied Mandel 's"bona fide" prong. In Bustamante v. Mukasey , for example, the court held that "the reason given by the consular official in support of the visa denial was *265 ... bona fide" because there was "no reason to believe that the consular official acted ... in anything other than good faith" in relying on information that the visa applicant "was involved in drug trafficking." 531 F.3d 1059, 1063 (9th Cir. 2008). Similarly, in Cardenas v. United States , the court held that a consular official "provided a bona fide factual reason" for denying a visa, and plaintiff made no allegations to "raise a plausible inference that the officer acted in bad faith." 826 F.3d 1164, 1172 (9th Cir. 2016). In no prior cases have plaintiffs alleged-let alone offered undisputed evidence-that any government official made public statements contradicting the asserted "bona fide" reason for the governmental action.[13] Plaintiffs have done so here.[14]
This, of course, does not mean that Plaintiffs have established that the Proclamation violates the Constitution. As we explained in IRAP I , 857 F.3d at 592-93, to do so, Plaintiffs must show that the Government cannot meet the test set forth in Lemon v. Kurtzman , 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To prevail under Lemon , a governmental entity must show that its challenged action (1) "ha[s] a secular legislative purpose," (2) with "its principal or primary effect ... one that neither advances nor inhibits religion," and (3) which does "not foster 'an excessive government entanglement with religion.' " Lemon , 403 U.S. at 612-13, 91 S.Ct. 2105 (quoting Walz , 397 U.S. at 674, 90 S.Ct. 1409 ). Moreover, the Government must satisfy all three prongs of Lemon to fend off an Establishment Clause challenge. Edwards v. Aguillard , 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).
Plaintiffs' challenge centers on the first prong. They maintain that the Government has failed to demonstrate that the Proclamation "has 'a secular legislative purpose' " that is "genuine, not a sham, and not merely secondary to a religious objective." McCreary , 545 U.S. at 860, 864, 125 S.Ct. 2722 (quoting Lemon , 403 U.S. at 612, 91 S.Ct. 2105 ). To meet this requirement, the Government must show that the primary purpose, not just a purpose, of the Proclamation is secular. See Edwards , 482 U.S. at 594, 107 S.Ct. 2573.
*266 The Supreme Court has instructed that, to determine the primary purpose of a challenged government action, judges must view the challenged government action as a reasonable "objective observer." McCreary , 545 U.S. at 862, 125 S.Ct. 2722. To that end, when a court examines the purpose of a challenged government action, it acts as an "objective observer" to discern the "official objective ... from readily discoverable fact, without any judicial psychoanalysis of the drafter's heart of hearts." Id. In this role, a court must look to "openly available data" and make a "commonsense conclusion" to determine whether a "religious objective permeated the government's action." Id . at 863, 125 S.Ct. 2722. The court should examine the "historical context" of the government action and the "specific sequence of events" leading to the government action. Edwards , 482 U.S. at 595, 107 S.Ct. 2573.
The Government maintains that the Proclamation's facial neutrality establishes that it is "not intended to discriminate on the basis of religion." First Br. 43. But even if the Proclamation's "stated objective is religiously neutral," that cannot be "dispositive" as "the entire premise of our review under Lemon is that even facially neutral government actions can violate the Establishment Clause." IRAP I , 857 F.3d at 595. No "reasonable observer" would accept such a "transparent claim to secularity" without also considering context and history. See McCreary , 545 U.S. at 863-84, 869, 125 S.Ct. 2722. The President's own statements provide the relevant history and context here.
Perhaps in implicit recognition of the rawness of the religious animus in the President's pre-election statements,[15] the Government urges us to disregard them. This is a difficult argument to make given that the President and his advisors have repeatedly relied on these pre-election statements to explain the President's post-election actions related to the travel ban. See, e.g ., J.A. 1502-03. And, in McCreary , the Supreme Court reminded us that "the world is not made brand new every morning." McCreary , 545 U.S. at 866, 125 S.Ct. 2722. Because "reasonable observers have reasonable memories," these statements certainly provide relevant context when examining the purpose of the Proclamation. Id . However, we need not and thus do not rely on pre-election statements in assessing the constitutionality of the Proclamation.
We need not do so because the President's inauguration did not herald a new day. Rather, only a week after taking office, President Trump issued EO-1, which banned the entry of citizens of six Muslim majority countries, provided exemptions for Christians, and lacked any asserted evidence indicating a genuine national security purpose. The very next day, January 28, 2017, Rudy Giuliani, an advisor to President Trump, explained that EO-1's purpose was to discriminate against Muslims. J.A. 808-10, 815-16. A reasonable observer could certainly conclude that in banning entry into the United States of *267 180 million Muslims, approximately 10% of the world Muslim population, EO-1 was crafted to deliver, as Giuliani said, on President Trump's promise to "ban Muslim immigration to the United States." See J.A. 809, 820. This is particularly so given that every federal judge who considered the matter enjoined EO-1, finding that it likely violated the Constitution.
Shortly after issuance of these injunctions of EO-1, President Trump issued EO-2, which he and his advisors characterized as being substantially similar to EO-1. The President described EO-2 as "a watered down version of the first order." J.A. 779. Senior Policy Advisor Stephen Miller similarly explained that the changes to EO-2 were "mostly minor technical differences," and promised that they would result in "the same basic policy outcomes for the country." J.A. 756. Then-White House Press Secretary Sean Spicer confirmed that "[t]he principles of the [second] executive order remain the same." J.A. 168. We subsequently found EO-2 also impermissibly motivated by religion, and upheld an injunction of it. IRAP I , 857 F.3d 554.
In the months that followed, the President continued to express his desire to return to "the original Travel Ban," rather than "the watered down, politically correct version" in EO-2. J.A. 791. On June 5, 2017, President Trump stated that the "Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court-& seek much tougher version!" and that "The Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to [the Supreme Court]." Id. (statements issued via Twitter). The very next day, then-White House Press Secretary Spicer explained that President Trump's tweets are "official statements by the president of the United States." J.A. 794, 1521. Only nine days before issuing the Proclamation, President Trump tweeted, "The travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!" J.A. 832.
The President also continued to express what any reasonable observer could view as general anti-Muslim bias. In an August 17, 2017, tweet, the President endorsed an apocryphal story involving General Pershing and a purported massacre of Muslims with bullets dipped in a pig's blood, advising people to "[s]tudy what General Pershing ... did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!" J.A. 806. On November 29, 2017, President Trump retweeted three disturbing anti-Muslim videos entitled: "Muslim Destroys a Statue of Virgin Mary!" "Islamist mob pushes teenage boy off roof and beats him to death!" and "Muslim migrant beats up Dutch boy on crutches!" J.A. 1497-99. The three videos were originally tweeted by an extremist political party whose mission is to oppose "all alien and destructive politic or religious doctrines, including ... Islam." J.A. 1508. When asked about the three videos, President Trump's deputy press secretary Raj Shah responded by saying that the "President has been talking about these security issues for years now, from the campaign trail to the White House" and "the President has addressed these issues with the travel order that he issued earlier this year and the companion proclamation." J.A. 1502-03. The Government does not-and, indeed, cannot-dispute that the President made these statements. Instead, it argues that the "statements that occurred after the issuance of EO-2 do not reflect any religious animus" but reflect "the compelling secular goal of protecting national security from an amply-documented present threat." First Br. 52. We cannot agree.
*268 Rather, an objective observer could conclude that the President's repeated statements convey the primary purpose of the Proclamation-to exclude Muslims from the United States. In fact, it is hard to imagine how an objective observer could come to any other conclusion when the President's own deputy press secretary made this connection express: he explained that President Trump tweets extremist anti-Muslim videos as part of his broader concerns about "security," which he has "addressed ... with ... the proclamation." J.A. 1502-03.
The Government correctly points out that the President's past actions cannot "forever taint" his future actions. See McCreary , 545 U.S. at 874, 125 S.Ct. 2722 ; First Br. 18. President Trump could have removed the taint of his prior troubling statements; for a start he could have ceased publicly disparaging Muslims. But "an implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense." McCreary , 545 U.S. at 874, 125 S.Ct. 2722. In fact, instead of taking any actions to cure the "taint" that we found infected EO-2, President Trump continued to disparage Muslims and the Islamic faith.
The Government unconvincingly claims that the substantive differences between the Proclamation and EO-1 and EO-2 reflect the elimination of any anti-Muslim bias. To be sure, the Proclamation does differ in some respects from the previous Executive Orders. For example, the Proclamation bans citizens from two non-majority Muslim countries, North Korea and Venezuela. Although the Proclamation affects only very few persons from those countries as opposed to the many tens of thousands from the other Muslim-majority countries, the Government asserts that "[t]he inclusion of those [two] non-Muslim-majority countries in the Proclamation underscores [a] religion-neutral purpose." First Br. 50. Again, we disagree. In McCreary , the Supreme Court found that despite the court-ordered addition of secular texts to a twice-challenged display of the Ten Commandments in state courthouses, "[n]o reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays." 545 U.S. at 872, 125 S.Ct. 2722. Here, a reasonable observer could hardly "swallow the claim" that the addition of North Korea and Venezuela to the twice-enjoined travel ban was anything more than an attempt to "cast off" the "unmistakable" religious objective of the earlier executive orders. See id .
Nor does the "months-long" "multi-agency review,"[16] First Br. 43, 47, on which the Proclamation assertedly rests, establish that its primary purpose is secular. Although in its briefs the Government repeatedly invoked this review, the Government chose not to make the review publicly available and so provided a reasonable observer no basis to rely on the review. Perhaps in recognition of this, at oral argument before us the Government expressly disavowed any claim that the *269 review could save the Proclamation. Instead, the Government conceded that the Proclamation rises and falls on its own four corners. Oral Arg. at 32:27-33:00. Even if we considered the review, we could not conclude that it demonstrates that the Proclamation has a secular purpose. This is because the criteria allegedly used in the review to identify problematic countries lie at odds with the list of countries actually included in the Proclamation.[17]
Like the district court, we do not note "the apparent disconnect between the identified problem[s]" in the review and "the broad, nationality-based travel ban to evaluate the merits" of the Proclamation as a policy. See IRAP v. Trump , 265 F.Supp.3d at 626-27. Rather, we do so "only to assess whether the Proclamation persuasively establishes that the primary purpose of the travel ban is no longer religious animus." See id. The contradiction between what the Proclamation says -that it merely reflects the results of a religion-neutral review-and what it does "raises serious doubts" about the Proclamation's proffered purpose, and undermines the Government's argument that its multi-agency review cured any earlier impermissible religious purpose. See The Florida Star v. B.J.F. , 491 U.S. 524, 540, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989).
In sum, the face of the Proclamation, read in the context of President Trump's official statements, fails to demonstrate a primarily secular purpose. To the objective observer, the Proclamation continues to exhibit a primarily religious anti-Muslim objective.
Our constitutional system creates a strong presumption of legitimacy for presidential action and we often defer to the political branches on issues related to immigration and national security. But the disposition in this case is compelled by the highly unusual facts here. Plaintiffs offer undisputed evidence that the President of the United States has openly and often expressed his desire to ban those of Islamic faith from entering the United States. The Proclamation is thus not only a likely Establishment Clause violation, but also strikes at the basic notion that the government may not act based on "religious animosity." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah , 508 U.S. 520, 532, 535, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).
We have long recognized that "[o]ur jurisprudence in this area is of necessity one of line-drawing, of determining at what point [an individual's] rights of religious freedom are infringed by the State." Lee v. Weisman , 505 U.S. 577, 598, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). And the line we draw "between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." Schempp , 374 U.S. at 294, 83 S.Ct. 1560 (Brennan, J., concurring). We therefore agree with the district court that Plaintiffs have demonstrated that they will likely *270 succeed on the merits of their Establishment Clause claim.
IV.
Having held that Plaintiffs are likely to succeed on the merits of their Establishment Clause claim, we now consider the three remaining Winter factors. See 555 U.S. at 20, 129 S.Ct. 365. We review the district court's decision for abuse of discretion and affirm that the likelihood of irreparable harm, the balance of equities, and the public interest all favor granting injunctive relief. See id. ; Aggarao , 675 F.3d at 366.
A.
As the district court rightly states, irreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy. IRAP v. Trump , 265 F.Supp.3d at 629 (citing 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (3d ed. 1998) ). The Supreme Court has held that the irreparable harm must be "likely," not merely possible. Winter , 555 U.S. at 22, 129 S.Ct. 365.
As the Supreme Court has stated, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns , 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); see also Johnson v. Bergland , 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of first amendment rights constitute per se irreparable injury."). Our sister circuits have interpreted Elrod to apply not just to freedom of speech and association but equally to Establishment Clause violations. See, e.g. , Chaplaincy of Full Gospel Churches v. England , 454 F.3d 290, 302 (D.C. Cir. 2006) ; Ingebretsen v. Jackson Pub. Sch. Dist. , 88 F.3d 274, 280 (5th Cir. 1996) ; Parents' Ass'n of P.S. 16 v. Quinones , 803 F.2d 1235, 1242 (2d Cir. 1986) ; ACLU of Ill. v. City of St. Charles , 794 F.2d 265, 275 (7th Cir. 1986) ("[A]n erosion of religious liberties cannot be deterred by awarding damages to the victims of such erosion."). We agree with these courts that Establishment Clause violations create the same type of immediate, irreparable injury as do other types of First Amendment violations. Chaplaincy of Full Gospel Churches , 454 F.3d at 303-04. Because the Proclamation violates the Establishment Clause and is already in full effect, we conclude that the injury is not only threatened and likely but already ongoing. See id. at 303 ("[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place[.]").
We further agree with the district court that the individual Plaintiffs whose family members are categorically rendered ineligible for visas have demonstrated a likelihood of irreparable harm. Prolonged and indefinite separation of parents, children, siblings, and partners create not only temporary feelings of anxiety but also lasting strains on the most basic human relationships cultivated through shared time and experience. IRAP Plaintiff John Doe No. 5's grandmother, a Yemeni national, has Alzheimer's disease and is currently living in uncertain conditions in Jordan. J.A. 574. Zakzok Plaintiff Fahed Muqbil has a one-year-old daughter who, due to severe birth defects, has been undergoing multiple life-threatening surgeries in the United States without her mother, a Yemeni national, by her side. J.A. 1244. IAAB Plaintiff Doe No. 6's wife is separated from her family and will be "completely devastated" if her mother, an Iranian national, is unable to visit her in the United States. J.A. 1175. These injuries are "not compensable with monetary damages." See Hawai'i v. Trump , 878 F.3d at 699. These injuries are *271 also likely to occur, if not already occurring, because the Proclamation is fully in effect and being enforced; indeed, IAAB Plaintiff John Doe No. 6's mother-in-law has already been denied a visa and waiver pursuant to the Proclamation during the pendency of this litigation.
We therefore affirm the district court's determination that Plaintiffs have sufficiently demonstrated a likelihood of irreparable harm.
B.
We now balance the harms likely to be suffered by the parties. We agree with the district court that the balance of equities weighs in favor of Plaintiffs, who are likely to continue suffering a violation of their Establishment Clause rights (the combination of religious marginalization with familial separation), rather than the Government, which is not likely to be harmed by an injunction against the enforcement of a likely unconstitutional Proclamation. IRAP v. Trump , 265 F.Supp.3d at 630.
While the Government asserts a national security interest behind the Proclamation, the district court did not abuse its discretion in concluding that the Government has not shown that national security cannot be maintained without the unprecedented multi-nation ban. Id. For one, the injunction does not result in the entry of any particular individual. It simply precludes the use of a nationality-based ban. Foreign nationals from the Designated Countries must still proceed through the standard individualized vetting process and prove that they are not inadmissible. See 8 U.S.C. § 1361. The INA provides numerous means to exclude individuals who present a risk to the United States. See, e.g. , 8 U.S.C. § 1182(a). The injunction, therefore, neither opens our borders nor creates any vulnerabilities, and the balance of equities, overall, favors injunctive relief.
However, as the district court recognized, we are obligated to follow the Supreme Court's rationale in partially staying the injunction of EO-2. See IRAP v. Trump , 265 F.Supp.3d at 630 (citing Trump , 137 S.Ct. at 2088 ). There, the Supreme Court concluded that the balance of equities will vary depending on the strength of the affected foreign national's connection to the United States. See Trump , 137 S.Ct. at 2088. Just as the Supreme Court tailored that injunction to those individuals who possess "a credible claim of a bona fide relationship with a person or entity in the United States," we adopt the same approach here. We therefore affirm the district court and conclude that the balance of equities supports an injunction only to the extent that it affords relief to foreign nationals with a bona fide relationship with an individual or entity in the United States. See infra Part V.
C.
Finally, we consider whether Plaintiffs have shown that the injunction is in the public interest. We conclude that it cannot be in the public interest for the President to violate the Establishment Clause. We also agree with the district court and the Ninth Circuit that the unlawfully issued Proclamation has a much broader deleterious effect on the public interest than the simple fact that certain foreign nationals are excluded. IRAP v. Trump , 265 F.Supp.3d at 630-31 ; Hawai'i v. Trump , 878 F.3d at 700-01.
On a human level, the Proclamation's invisible yet impenetrable barrier denies the possibility of a complete, intact family to tens of thousands of Americans. J.A. 868-69. On an economic level, the Proclamation inhibits the normal flow of information, ideas, resources, and talent between *272 the Designated Countries and our schools, hospitals, and businesses.[18] On a fundamental level, the Proclamation second-guesses our nation's dedication to religious freedom and tolerance. "The basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope of attainment of that end." Schempp , 374 U.S. at 305, 83 S.Ct. 1560 (Goldberg, J., concurring). When we compromise our values as to some, we shake the foundation as to all. Schempp , 374 U.S. at 225, 83 S.Ct. 1560 ("The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.' " (citation omitted) ).
For those reasons, we affirm the district court's conclusion that enjoining the unlawful Proclamation is in the public interest.
V.
Finally, we review for abuse of discretion the district court's grant of a nationwide injunction against enforcement of § 2 of the Proclamation, excepting North Korea and Venezuela. Aggarao , 675 F.3d at 366. We affirm.
In its opinion granting the preliminary injunction, the district court narrowed the scope of its nationwide injunction to apply to only those individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States." IRAP v. Trump , 265 F.Supp.3d at 631 (quoting Trump , 137 S.Ct. at 2088 ). The district court did so in accordance with the Supreme Court's partial stay of the prior nationwide injunction against EO-2 that this Court and the Ninth Circuit had affirmed. Trump , 137 S.Ct. at 2088. Under the Supreme Court's framework, a bona fide relationship with a person requires "a close familial relationship," which encompasses immediate family members such as parents, children, siblings, "grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States." Hawai'i v. Trump , 871 F.3d 646, 658 & n.8 (9th Cir. 2017) (clarifying scope of injunction against EO-2); see Trump v. Hawai'i , --- U.S. ----, 138 S.Ct. 1, 1, 198 L.Ed.2d 776 (2017) (mem.) (declining to stay the Ninth Circuit's clarification of familial relationships). A bona fide relationship with an entity or organization must be "formal, documented, and formed in the ordinary *273 course, rather than for the purpose of evading EO-2." Trump , 137 S.Ct. at 2088.
The district court's injunction adopts the scope laid out by the Supreme Court-with one potential exception. IRAP v. Trump , 265 F.Supp.3d at 631. The district court concluded that "clients of IRAP and HIAS, and those similarly situated, are not covered by the injunction absent a separate bona fide relationship as defined above." Id. In support, the district court referenced the Supreme Court's stay of the Ninth Circuit's decision "that a refugee with a formal sponsorship assurance from a U.S. resettlement agency" categorically had "a bona fide connection to the United States." Id. ; see Hawai'i v. Trump , 871 F.3d at 661-64 (concluding that refugees who have formal assurances from resettlement agencies have bona fide relationships); Trump v. Hawai'i , 138 S.Ct. at 1 (staying the Ninth Circuit's holding "with respect to refugees covered by a formal assurance"). Like Plaintiffs, who asked the district court to clarify its order, J.A. 49 (No. 17-cv-361, ECF No. 226), we find the district court's holding subject to several different interpretations. To the extent that the district court held that IRAP, HIAS, and similar organizations categorically lack a qualifying bona fide relationship with their clients, we conclude that this would be an abuse of discretion. We see no need to read more into the Supreme Court's grant of a stay than what it held: that refugees with formal assurances do not categorically enjoy a bona fide relationship with a U.S. entity. Instead, IRAP, HIAS, and other organizations that work with refugees or take on clients are subject to the same requirements as all other entities under the Supreme Court's bona fide relationship standard: a relationship that is "formal, documented, and formed in the ordinary course, rather than for the purpose" of evading the travel restrictions imposed by the Proclamation. See Trump , 137 S.Ct. at 2088.
With this caveat, we conclude that the district court did not abuse its discretion in enjoining §§ 2(a)-(c), (e), and (g)-(h) of the Proclamation, narrowed by the Supreme Court's bona fide relationship standard. IRAP v. Trump , 265 F.Supp.3d at 631-32 (citing Trump , 137 S.Ct. at 2088 ). We agree that the balance of the equities favor the Government and that the injunction should not extend to § 2(d) (North Korea) and § 2(f) (Venezuela) because there is no alleged Establishment Clause violation as to either. We also agree that the injunction does not apply to the President himself but instead to the other Defendants (agencies and agency heads) charged with implementing the Proclamation. IRAP I , 857 F.3d at 605.
For the same reasons as in IRAP I , we conclude that the district court did not abuse its discretion in adopting a nationwide injunction. Id. ; IRAP v. Trump , 265 F.Supp.3d at 632. First, Plaintiffs are scattered throughout the country, making piecemeal injunctive relief difficult. Richmond Tenants Org., Inc. v. Kemp , 956 F.2d 1300, 1308-09 (4th Cir. 1992). Second, "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and uniformly .' " Texas v. United States , 809 F.3d 134, 187-88 (5th Cir. 2015) (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384), affirmed by equally divided court , --- U.S. ----, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016). Finally, because we find that the Proclamation was issued in violation of the Constitution, enjoining it only as to Plaintiffs would not cure its deficiencies. IRAP I , 857 F.3d at 605.
Finally, we have adopted the bona fide relationship limitation only because this case comes to us in an interlocutory posture.
*274 We are reviewing the entry of a preliminary injunction and so must balance the equities, including the Government's interest in enforcing the Proclamation. See Trump , 137 S.Ct. at 2088. But if a court eventually holds on the merits that the Proclamation was issued in contravention of the Constitution (as we believe it should), then the unlawful portions of the Proclamation should be voided.
VI.
For all of these reasons, we affirm the preliminary injunction granted by the district court. In light of the Supreme Court's order staying this injunction pending "disposition of the Government's petition for a writ of certiorari, if such writ is sought," we stay our decision today pending the Supreme Court's decision. Trump v. IRAP , 138 S.Ct. at 542.
AFFIRMED
GREGORY, Chief Judge, with whom Judge Wynn joins as to Part I, concurring:
The statutory question is this: whether the President has the congressionally delegated authority to enact modern-day analogs of the repealed Chinese Exclusion Act or nationality-based quota system. In light of legislative and executive practice spanning centuries, I conclude that he does not.
I.
Plaintiffs argue that, in issuing the Proclamation,[1] the President exceeded his authority under the Immigration and Nationality Act (INA), see 8 U.S.C. §§ 1182(f), 1185(a)(1), and violated the INA's prohibition on nationality discrimination in the issuance of immigrant visas, see 8 U.S.C. § 1152. Before considering Plaintiffs' arguments on the merits, I must first determine that their statutory claims are justiciable.
The Government makes several arguments to the contrary. First, it claims that Congress has stripped the Court of subject-matter jurisdiction to hear the claims. Second, it argues that the doctrine of consular nonreviewability bars judicial review. Third, it argues that Plaintiffs lack Article III standing to sue. And fourth, it argues that Plaintiffs do not have a cause of action to bring their statutory claims, under the APA or otherwise. I address these arguments in turn and conclude that the statutory claims are justiciable.[2]
A.
Subject to limitations imposed by Congress, the Constitution extends the federal judicial power "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties Made, or which shall be made, under their Authority." U.S. Const. art. III, § 2, cl. 1. Since 1875, Congress has provided the federal courts with original jurisdiction over civil claims "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 ; Judiciary Act of 1875, Pub. L. No. 43-137, § 1, 18 Stat. 470. Since 1980, Congress has provided federal courts with this original jurisdiction over federal questions irrespective of the amount in controversy. 28 U.S.C. § 1331 ; Federal Question Jurisdictional Amendments *275 Act of 1980, Pub. L. No. 96-486, § 2, 94 Stat. 2369.
In their motion for a preliminary injunction, Plaintiffs allege that the Proclamation violates the Establishment Clause and the INA. These questions are on the face of Plaintiffs' Complaints, substantial, and central to their claims. See 13D Charles Alan Wright, et al., Federal Practice and Procedure § 3562 (3d ed. Supp. 2017). Thus, Plaintiffs have squarely presented two questions that "aris[e] under the Constitution" and "laws ... of the United States." 28 U.S.C. § 1331.
But, even where a plaintiff squarely presents federal questions, a district court may still lack jurisdiction to resolve the dispute if Congress has precluded judicial review. See, e.g. , Elgin v. Dep't of Treasury , 567 U.S. 1, 8-10, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012). Absent "clear congressional language mandating preclusion of federal jurisdiction and the nature of respondents' requested relief," federal courts have jurisdiction under § 1331 to hear "constitutional and statutory challenges" to immigration procedures. McNary v. Haitian Refugee Ctr., Inc. , 498 U.S. 479, 483-84, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) ; see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md. , 535 U.S. 635, 643-44, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (holding that statute does not strip federal courts of federal question jurisdiction absent plain statement or fair implication); Webster v. Doe , 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (requiring "clear" showing of intent if Congress seeks to preclude judicial review of "colorable constitutional claim"); Bowen v. Mich. Acad. of Family Physicians , 476 U.S. 667, 670, 681 n.12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (reaffirming "strong presumption that Congress intends judicial review of administrative action"); cf. Elgin , 567 U.S. at 10, 132 S.Ct. 2126 (holding that congressional intent need only be "fairly discernible in the statutory scheme" in cases where Congress has not foreclosed all judicial review but merely limited or redirected it (quoting Thunder Basin Coal Co. v. Reich , 510 U.S. 200, 207, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) ) ).
The Government argues that the INA forecloses any judicial review of Plaintiffs' statutory claims. First Cross-Appeal Br. 19-20 (hereinafter "First Br."). In support, it points to two discreet statutory provisions: 6 U.S.C. § 236(f) and 8 U.S.C. § 1201(i). But neither provision applies to this case, much less provides the clear expression of congressional intent needed to strip this Court of subject-matter jurisdiction here.
The first, § 236(f), does not actually strip federal courts of anything. Instead, it denies prospective plaintiffs a cause of action to challenge individual decisions by consular officers in granting and denying visas. 6 U.S.C. § 236(f) ("Nothing in this section shall be construed to create or authorize a cause of action to challenge a decision of a consular officer or other United States official or employee to grant or deny a visa."). But the absence of a statutory cause of action is irrelevant to this Court's exercise of subject-matter jurisdiction. To the contrary, it is "firmly established in our cases that the absence of a valid ... cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case." Verizon , 535 U.S. at 642-43, 122 S.Ct. 1753 (quoting Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ); see Michigan v. Bay Mills Indian Cmty. , --- U.S. ----, 134 S.Ct. 2024, 2029 n.2, 188 L.Ed.2d 1071 (2014) (noting that § 1331"gives a district court subject-matter jurisdiction to decide any claim alleging a violation of" federal Indian Gaming Regulatory *276 Act, even if plaintiffs may ultimately lack statutory cause of action). Moreover, as I discuss in Part I.B, Plaintiffs are not challenging a consular officer's denial of visas to their family members; instead, they are challenging the President's authority to issue a policy that makes Plaintiffs' family members categorically ineligible to be considered for visas. Section 236(f) therefore does not affect this Court's subject-matter jurisdiction.
The second provision that the Government cites, § 1201(i), strips federal courts of jurisdiction to review decisions by a consular officer or the Secretary of State to "revoke" a visa that has already been issued. 8 U.S.C. § 1201(i). But the Proclamation explicitly states that "[n]o immigrant or nonimmigrant visa issued before the applicable effective date under section 7 of this proclamation shall be revoked pursuant to this proclamation." 82 Fed. Reg. at 45,171. And the Proclamation applies only to foreign nationals who "do not have a valid visa on the applicable effective date." Id. at 45,167. Because no visa can or will be revoked under the Proclamation, Plaintiffs' claims do not fall within § 1201(i).
That the Government cannot point to an INA provision clearly stripping this Court of jurisdiction over Plaintiffs' statutory claims is not surprising. One need only glance through the INA to see that Congress has taken a careful and narrow approach to jurisdiction, precluding judicial review over only discrete exercises of executive authority. See, e.g. , McNary , 498 U.S. at 492, 111 S.Ct. 888 (finding that INA provision stripping jurisdiction to review individual denials of Special Agricultural Worker (SAW) status did not strip jurisdiction over "general collateral challenges to unconstitutional practices and policies used by the agency in processing [SAW] applications"). When courts have treaded beyond the lines drawn by Congress in the INA, the legislative branch has taken quick action to reestablish its intended jurisdictional boundaries. Compare I.N.S. v. St. Cyr , 533 U.S. 289, 314, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (finding that several jurisdiction-stripping provisions then-recently added to INA § 242 did not repeal habeas jurisdiction over certain removal orders), with Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Pub. L. No. 109-13, § 106, 119 Stat. 231, 310-11 (2005) (adding language to INA § 242 expressly stripping courts of habeas jurisdiction).
Congress's precision is exemplified by 8 U.S.C. § 1182, the INA section in which one of the purported authorizations for the Proclamation, § 1182(f), is located. Section 1182 includes ten express preclusions of jurisdiction, each tied to a narrow exercise of executive authority, but none applies to actions taken under § 1182(f). See 8 U.S.C. §§ 1182(a)(5)(C) (stating that certain decisions by Secretary of Health and Human Services related to admissibility of foreign health-care workers "are not subject to further administrative or judicial review"), 1182(a)(9)(B)(v) (precluding judicial review of decisions by Attorney General to waive inadmissibility for certain undocumented immigrants), 1182(a)(10)(C)(ii)(III) (giving Secretary of State "sole and unreviewable discretion" over certain inadmissibility decisions related to child abduction), 1182(a)(10)(C)(iii)(II) (giving Secretary of State "sole and unreviewable discretion" over certain designation related to child abduction), 1182(d)(3)(B)(i) (precluding judicial review of determination by Secretary of State to waive inadmissibility for certain nonimmigrants who would otherwise be ineligible for terrorism-related reasons), 1182(d)(12) (precluding judicial review of decisions by Attorney General to grant or deny waiver for individuals subject to certain *277 civil penalties), 1182(h) (precluding judicial review of determination by Attorney General to waive inadmissibility for individuals convicted of certain crimes), 1182(i) (precluding judicial review of decision by Attorney General to waive inadmissibility for certain individuals who committed fraud or willful misrepresentation of material fact), 1182(n)(2)(G)(vii) (precluding judicial review of certain determinations by Secretary of Labor related to nonimmigrant labor visas) 1182(n)(5)(D)(i)-(iii) (giving federal courts jurisdiction to "review only the actions of the Attorney General under clause (ii)" and to "set aside such actions only on the grounds described in subparagraph (A), (B), or (C) of section 706(a)(2) of Title 5").
In the more than sixty-five years since § 1182(f) was written, and despite more than five dozen amendments to § 1182 overall, Congress has never precluded judicial review of executive actions taken pursuant to the President's authority under § 1182(f). Nor did Congress preclude judicial review in the almost quarter-century since the Supreme Court reviewed an executive order issued under § 1182(f). See Sale v. Haitian Ctrs. Council, Inc. , 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). Congress also has not precluded judicial review of the President's exercise of authority under § 1185 (the other INA provision on which the Proclamation relies), nor of a challenge to executive action for violating § 1152 (the INA provision that prohibits nationality discrimination). Accordingly, I see no clear statement of intent, much less a fair implication, that would deprive this Court of subject-matter jurisdiction here. See Verizon , 535 U.S. at 643-44, 122 S.Ct. 1753 ; McNary , 498 U.S. at 483-84, 111 S.Ct. 888.
I thus conclude that this Court has subject-matter jurisdiction to hear Plaintiffs' statutory claims: Plaintiffs have sued under § 1331 for (among other things) violation of the INA, the Government has appealed from an interlocutory order granting Plaintiffs a preliminary injunction, see 28 U.S.C. § 1292(a)(1), and Congress has not stripped this Court's power to review challenges to the exercise of executive authority under § 1182(f) and § 1185(a)(1).
B.
The Government next argues that the doctrine of consular nonreviewability precludes this Court from reviewing any statutory challenge to the President's authority to exclude classes of noncitizens, no matter how unlawful that decision may be. No case from either this Court or the Supreme Court supports such a sweeping proposition.
The consular nonreviewability doctrine provides that, absent congressional authorization, courts lack jurisdiction to review a consular officer's decision to grant or deny a visa. Saavedra Bruno v. Albright , 197 F.3d 1153, 1159 (D.C. Cir. 1999). The doctrine developed from the Supreme Court's recognition that Congress has plenary power over immigration matters and may vest the exclusive authority to enforce its stated policy in the Executive Branch. See The Chinese Exclusion Case , 130 U.S. 581, 609, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) (holding that power to exclude foreign nationals is "incident of sovereignty belonging to the government of the United States," and Congress's determinations regarding whom to exclude are conclusive and binding on judiciary); Nishimura Ekiu v. United States , 142 U.S. 651, 659-60, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) (noting that Congress may delegate authority to exclude foreign nationals to executive officers, in which case courts cannot second-guess decisions by those officers acting within delegated authority);
*278 Lem Moon Sing v. United States , 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895) ("The power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled."). The doctrine thus serves "to honor Congress's choices in setting immigration policy" by shielding implementation of that policy from judicial interference. Hawai'i v. Trump , 878 F.3d 662, 680 (9th Cir. 2017).
But Plaintiffs do not ask this Court to second-guess Congress's policy decisions, nor do they ask this Court to review the substance of the Executive Branch's exercise of discretion in enforcing those policy decisions. The Complaints do not challenge any individual visa denials or ask the district court to order the Executive Branch to grant any visas. Rather, Plaintiffs claim that the President exceeded the authority that Congress delegated to him in § 1182(f) and § 1185(a)(1), and that in issuing the Proclamation, the President supplanted Congress's immigration policy with his own. The consular nonreviewability doctrine-applicable only to individualized visa determinations and designed to protect Congress's plenary power in immigration matters-plainly does not bar review here. See Saavedra Bruno , 197 F.3d at 1158-59.[3]
The Supreme Court's decision in United States ex rel. Knauff v. Shaughnessy , on which the Government heavily relies, further illustrates the doctrine's purpose and inapplicability to this case. See 338 U.S. 537, 543, 70 S.Ct. 309, 94 L.Ed. 317 (1950). There, Congress had passed a statute (the "1941 Act") specifically authorizing the President to restrict immigration during a proclaimed national emergency. Id. at 539-40, 70 S.Ct. 309. The President had in turn issued a proclamation authorizing the Secretary of State and Attorney General to promulgate regulations imposing additional immigration restrictions, which they proceeded to do. Id. A foreign national, whom the Attorney General had excluded from the United States without a hearing pursuant to those regulations, argued that the 1941 Act was an unconstitutional delegation of legislative power. Id. at 542, 70 S.Ct. 309. Responding to this constitutional question, the Court explained that "the decision to admit or to exclude an alien may be lawfully placed with the President," and "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." Id. at 543, 70 S.Ct. 309 (citing Nishimura Ekiu , 142 U.S. at 659-60, 12 S.Ct. 336, among other cases). In other words, the Court reaffirmed the longstanding principle that, so long as the political branches act within constitutional limits, courts may not question their combined wisdom in immigration matters. See id.
But this principle does not apply when determining whether the Executive Branch has complied with the Legislative Branch's commands. Like Plaintiffs here, the foreign national in Knauff also argued that her exclusion was inconsistent with congressional intent-that the Executive Branch had frustrated rather than implemented the policy embodied in another statute, the War Brides Act. Id. at 545, 70 S.Ct. 309. Notwithstanding the consular nonreviewability doctrine, the Court adjudicated this statutory claim on the merits. See id. at 545-47, 70 S.Ct. 309 (interpreting *279 1941 Act and War Brides Act and ultimately concluding executive action was consistent with both statutes). In fact, three dissenting justices not only would have decided the statutory claim on the merits but would have held that the executive had exceeded its delegated authority. See id. at 550, 70 S.Ct. 309 (Jackson, J., dissenting).
Knauff thus highlights the distinction between a challenge to the substance of the executive's decision and a challenge to the authority of the executive to issue that decision. Whereas the former invites courts to controvert the political branches' joint decisions regarding whom to exclude and therefore falls within the doctrine of consular nonreviewability, see id. at 542-43, 70 S.Ct. 309, the latter presents precisely the type of question that the Constitution entrusts courts with deciding. See Marbury v. Madison , 1 Cranch 137, 177, 5 U.S. 137, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); see also I.N.S. v. Chadha , 462 U.S. 919, 953 n.16, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (explaining that judicial review-not bicameral process-operates as check on executive lawmaking).
Finally, the Government contends that even if the consular nonreviewability doctrine does not apply to the President's decision to categorically exclude a class of foreign nationals, the rationale behind the doctrine does. But that rationale-that the political branches, not the judiciary, set and implement immigration policy-applies only where the executive acts within the scope of its delegated authority. See Nishimura Ekiu , 142 U.S. at 660, 12 S.Ct. 336 ("It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government." (emphasis added) ). It has no bearing on Plaintiffs' claims that the President exceeded the scope of his authority.
For these reasons, I conclude that the doctrine of consular nonreviewability does not bar Plaintiffs' statutory claims.
C.
I turn next to the Government's argument that the Plaintiffs lack standing. The district court determined that numerous individual and organizational plaintiffs have standing to make out an INA claim. The Government has challenged only the imminence of Plaintiffs' injuries, but the Court has "an obligation to assure ourselves of litigants' standing under Article III." DaimlerChrysler Corp. v. Cuno , 547 U.S. 332, 340, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (citation omitted). I conclude that sixteen individual Plaintiffs and four organizational Plaintiffs have standing to bring claims under the INA.
The Supreme Court has articulated three requirements to make out Article III standing. The plaintiff "must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc. , 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defs. of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). An organization can have associational standing to sue "on behalf of its members when its members would otherwise have standing to *280 sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Laidlaw , 528 U.S. at 180-81, 120 S.Ct. 693. An organization can also sue on its own behalf, in which case it must meet the same three minimum requirements. Lane v. Holder , 703 F.3d 668, 674 (4th Cir. 2012). It can demonstrate the requisite injury-in-fact by showing "concrete and demonstrable injury to the organization's activities-with the consequent drain on the organization's resources." Havens Realty Corp. v. Coleman , 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).
Plaintiffs must have standing for every claim, but the same injury can provide standing for multiple claims and one party with standing is sufficient to satisfy Article III. Bostic v. Schaefer , 760 F.3d 352, 370-71 (4th Cir. 2014) ; see generally ante 257-58. Because courts must "assume that on the merits the plaintiffs would be successful in their claims," Cooksey v. Futrell , 721 F.3d 226, 239 (4th Cir. 2013) (quoting City of Waukesha v. EPA , 320 F.3d 228, 235 (D.C. Cir. 2003) ), I assume for standing purposes that the Proclamation exceeds the scope of the President's power under § 1182(f) and § 1185(a)(1) and violates § 1152(a)(1).
I turn first to the individual Plaintiffs. Twelve individual Plaintiffs "have immediate family members who are nationals of the Designated Countries and currently in the process of securing a visa to come to the United States as immigrants."[4] Int'l Refugee Assistance Project (IRAP) v. Trump , 265 F.Supp.3d 570, 596 (D. Md. 2017). They are: IRAP Plaintiffs Jane Doe No. 2, John Doe No. 4, and John Doe No. 5; IAAB Plaintiffs Doe No. 1, Doe No. 3, Doe No. 4, and Doe No. 5; and Zakzok Plaintiffs Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe No. 1, and Jane Doe No. 2. The other four individual Plaintiffs have immediate family members seeking nonimmigrant visas to the United States. They are: IRAP Plaintiff Afsaneh Khazaeli; IAAB Plaintiffs Doe No. 2 and Doe No. 6; and Zakzok Plaintiff Jane Doe No. 3.
These sixteen individual Plaintiffs express fear and apprehension at the possibility of prolonged separation from their close family members. E.g. , J.A. 587-89 (IRAP Plaintiff John Doe No. 4, stating that being apart from his Iranian wife is "excruciatingly difficult" and is adversely affecting his professional and personal life); J.A. 1174-76 (IAAB Plaintiff Doe No. 6, stating that he has been "extremely anxious, sad, and worried" since the Proclamation and fears that his wife will be "completely devastated" if her family members are barred from receiving nonimmigrant visas); J.A. 1244-48 (Zakzok Plaintiff Fahed Muqbil, stating that he was "devastated" when he heard about the Proclamation and is "very worried at the thought of my wife being permanently banned from rejoining me and our young daughter in the United States," in large part because his daughter has had several life-threatening surgeries for birth defects and cannot travel to see her mother).
As of December 8, 2017, the relevant agencies have fully implemented the entry restrictions laid out in the Proclamation. Dep't of State, New Court Order on Presidential Proclamation (Dec. 4, 2017) (saved as ECF opinion attachment 1) (hereinafter "State Department Statement"); see also DHS, Fact Sheet: The President's Proclamation on Enhancing Vetting Capabilities *281 and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats (Sept. 24, 2017) (saved as ECF opinion attachment 2) (hereinafter "DHS Fact Sheet"). Even though the visa applications for Plaintiffs' relatives are still pending, Plaintiffs' relatives are now categorically ineligible for visas.[5] Indeed, during the pendency of this litigation, the mother-in-law of IAAB Plaintiff Doe No. 6 was denied a visa and a waiver pursuant to the Proclamation. Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645."). According to the Government's own statements, this means that IAAB Plaintiff Doe No. 6 has standing to bring suit. See First Br. 23 ("If any alien in whose entry a U.S. plaintiff has a cognizable interest is found otherwise eligible for a visa and denied a waiver, then that plaintiff can bring suit at that time...."); Oral Arg. at 15:58-16:23 (stating that sole challenge Government made to Article III standing was one of imminence).
I further conclude that the fifteen other individual Plaintiffs, whose relatives have not received visa decisions, also have standing. First, the Government does not contest that an executive action "prolong[ing] the separation of immediate family members" constitutes injury-in-fact sufficient to satisfy Article III. Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs (LAVAS ), 45 F.3d 469, 471 (D.C. Cir. 1995), vacated on other grounds , 519 U.S. 1, 117 S.Ct. 378, 136 L.Ed.2d 1 (1996) (per curiam); see also Abourezk v. Reagan , 785 F.2d 1043, 1050-51 (D.C. Cir. 1986), aff'd by an equally divided court , 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).[6] There is no question that these Plaintiffs have a "personal stake in the outcome of the controversy"-the chance of seeing their close relatives again depends on it. Massachusetts v. EPA , 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (quoting Baker v. Carr , 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ). Second, it is undisputed that the Proclamation *282 has caused these injuries by categorically rendering these Plaintiffs' relatives ineligible for visas, which prolongs their separation. Finally, enjoining the Proclamation will redress these injuries by allowing these Plaintiffs' relatives to proceed through the individualized vetting process. Whether these Plaintiffs' relatives are issued visas and admitted to the country is beyond the scope of this litigation and ultimately not subject to judicial review. See Part I.B, supra . But a plaintiff need "not show that a favorable decision will relieve his every injury." Larson v. Valente , 456 U.S. 228, 242-43 & n.15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (holding that plaintiffs had standing to challenge one part of state law requiring registration under charitable solicitation statute, even if plaintiffs might ultimately be required to register for different reasons); accord Regents of Univ. of Cal. v. Bakke , 438 U.S. 265, 280 n.14, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Instead, "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself," Larson , 456 U.S. at 242-43 & n.15, 102 S.Ct. 1673 -here, the prolonged (verging on permanent) separation caused by Plaintiffs' relatives' categorical ineligibility. Therefore, I conclude that these sixteen individual Plaintiffs have standing to challenge the Proclamation for violating the INA.
In addition, the district court concluded that MESA and YAMA had associational standing because both "identify at least one individual member who is a U.S. citizen or [lawful permanent resident] seeking to secure an immigrant visa for a close relative from one of the Designated Countries." IRAP v. Trump , 265 F.Supp.3d at 599. I agree and adopt the district court's reasoning. Both organizations have at least one member who has or will imminently sponsor a close family member from one of the Designated Countries for an immigrant visa. J.A. 556 (MESA), 612-13 (YAMA). The interests raised by their claims are "germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Laidlaw , 528 U.S. at 180-81, 120 S.Ct. 693 ; IRAP v. Trump , 265 F.Supp.3d at 599. Thus, MESA and YAMA have associational standing.
Finally, the district court held that IRAP, MESA, and IAAB had organizational standing because the Proclamation injures their proprietary and organizational interests. IRAP v. Trump , 265 F.Supp.3d at 597-98. I again agree with the district court and adopt its reasoning. For example, the Proclamation prevents an IRAP staff member who is Syrian from traveling to New York for IRAP's annual week-long retreat, which is critical to its organizational and strategic activities. J.A. 577-78. The Proclamation also prevents many of MESA's members (many of whom are nationals of the Designated Countries and live abroad) from attending its annual meeting, the revenue from which amounts to half of MESA's annual budget. J.A. 87-90, 555-60. And the Proclamation will prevent nationals from the Designated Countries from attending and speaking at IAAB's International Conference, scheduled for April 2018, and already has prevented foreign nationals from attending its overnight camps. J.A. 1152-54. These constitute concrete, actual injuries to each organization's activities, caused by the Proclamation and redressible by this Court, see Larson , 456 U.S. at 242-43 & n.15, 102 S.Ct. 1673 -making them cognizable under Article III. See Havens Realty , 455 U.S. at 379, 102 S.Ct. 1114 (holding that perceptible impairment of organization's activities and services constitutes injury *283 in fact); IRAP v. Trump , 265 F.Supp.3d at 597-98.
In sum, although only one Plaintiff need allege facts sufficient to establish Article III standing, Bostic , 760 F.3d at 370-71, I find that sixteen individual Plaintiffs and four organizational Plaintiffs have standing to bring claims under the INA.
D.
Finally, the Government claims that Plaintiffs lack a cause of action to sue under the INA. A "cause of action"-often referred to synonymously (and confusingly) as a "private right of action"-is a term of art "employed specifically to determine who may judicially enforce" certain "statutory rights or obligations." Davis v. Passman , 442 U.S. 228, 239, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Whether Plaintiffs have "asserted a cause of action ... depends not on the quality or extent" of their legal injuries but "on whether the class of litigants" of which Plaintiffs are members "may use the courts to enforce the right at issue." Id. at 239 n.18, 99 S.Ct. 2264.[7]
I conclude that Plaintiffs have a cause of action under the APA to challenge the final action of the agencies now implementing the Proclamation. I also conclude that this Court has inherent authority to review allegations that executive action exceeds a legislatively delegated grant of authority.
1.
The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. This "omnibus judicial-review provision" allows plaintiffs to sue "for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." Lexmark Int'l, Inc. v. Static Control Components, Inc. , --- U.S. ----, 134 S.Ct. 1377, 1389, 188 L.Ed.2d 392 (2014). To bring a claim under the APA, a plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. But the APA is unavailable if the "statute[ ] precludes judicial review," or "agency action is committed to agency discretion by law." Id. § 701(a).
The Government challenges Plaintiffs' ability to invoke the APA on four grounds: First, the Proclamation is not agency action; second, whatever agency action may exist is not final; third, Plaintiffs are not "adversely affected or aggrieved" within the meaning of the INA; and fourth, whatever agency action may exist is committed to agency discretion by law.[8] I disagree.
First, the Plaintiffs have properly challenged agency action. The APA applies only to agency action, which "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Relevant here, the APA defines "relief" to include the "taking of other action on the application or petition of, and beneficial to, a person," and a "sanction" to include the "withholding of relief." Id. § 551(10)(B), (11)(C).
*284 The Government correctly points out that the "President is not an agency within the meaning" of the APA and therefore cannot take "agency action." See Franklin v. Massachusetts , 505 U.S. 788, 796, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (plurality opinion). But "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." Id. at 828, 112 S.Ct. 2767 (Scalia, J., concurring); see also Chamber of Commerce of U.S. v. Reich , 74 F.3d 1322, 1327 (D.C. Cir. 1996) (noting that whether an agency's actions are "based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question").
Here, Plaintiffs have sued some or all of the following agencies and agency heads: DHS and Kirstjen M. Nielsen in her official capacity as Secretary of Homeland Security; the State Department and Rex Tillerson in his official capacity as Secretary of State; ODNI and Daniel R. Coats in his official capacity as Director of National Intelligence; Jefferson Beauregard Sessions, III in his official capacity as Attorney General; Kevin K. McAleenan in his official capacity as Acting Commissioner of CBP; and L. Francis Cissna in his official capacity as Director of USCIS. These agencies and agency heads have fully implemented, as of December 8, 2017, the entry restrictions laid out in the Proclamation. State Department Statement, supra ("Per the Supreme Court's orders, those restrictions will be implemented fully, in accordance with the Presidential Proclamation, around the world, beginning December 8 at open of business, local time."); see also DHS Fact Sheet, supra . As a result, nationals of the Designated Countries will no longer be issued some or all types of immigrant, nonimmigrant, and diversity visas. State Department Statement, supra ; see also IRAP v. Trump , 265 F.Supp.3d a t 608.[9] Rather than considering all visa applications under the standard individualized vetting process, consular officers will now "make a determination whether an applicant otherwise eligible for a visa is exempt from the Proclamation or, if not, may be eligible for a waiver under the Proclamation and therefore issued a visa." State Department Statement, supra .
Functionally, therefore, the relevant agencies are implementing the Proclamation by categorically rejecting visa applications from nationals in the Designated Countries who do not meet the high standard for a waiver not applicable to other nationalities. See id. (stating that to receive a waiver, individual must show that "issuance [of a visa] is in the national interest, the applicant poses no national security or public safety threat to the United States, and denial of the visa would cause undue hardship"); e.g. , Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645."). This categorical refusal to issue visas satisfies the APA's definition of a sanction: it is the "withholding" of "beneficial" "action on the application[s]" for immigrant and nonimmigrant visas submitted by foreign nationals of the Designated Counties.
*285 5 U.S.C. § 551(10)(B), (11)(C) ; see Abulkhair v. President of U.S. , 494 Fed.Appx. 226, 230 (3d Cir. 2012) (per curiam) (citing § 551(11)(C) in discussion about an individual's naturalization application).
Second, the Plaintiffs have alleged final agency action. The APA limits judicial review of agency actions with no other adequate remedy in court to final agency decisions. 5 U.S.C. § 704. The Government claims that there "has been no 'final' agency decision denying a visa based on the Proclamation to any of the aliens abroad identified by plaintiffs." First Br. 22; accord Third Cross-Appeal Br. 8 (hereinafter "Third Br."). During the pendency of this litigation, one of the individual Plaintiffs' relatives was denied both a visa and a waiver pursuant to the Proclamation, rendering the Government's argument moot. Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162. But I also reject the Government's argument on the merits, as it misapprehends Plaintiffs' claims.
There is no talismanic measurement of final agency action. Rather, the Court looks to whether the action "mark[s] the consummation of the agency's decisionmaking process" and whether the action is "one by which rights or obligations have been determined[ ] or from which legal consequences will flow." Bennett v. Spear , 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks and citations omitted). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin , 505 U.S. at 797, 112 S.Ct. 2767 (plurality opinion). Final agency action is not "tentative" or "interlocutory" but instead has a "direct and immediate" effect. Id. ; see Bennett , 520 U.S. at 178, 117 S.Ct. 1154. But the measure of finality is also "pragmatic"; an agency action is "immediately reviewable" when it gives notice of how a certain statute will be applied even if no action has yet been brought. U.S. Army Corps of Eng'rs v. Hawkes Co. , --- U.S. ----, 136 S.Ct. 1807, 1815, 195 L.Ed.2d 77 (2016).
In implementing the Proclamation's travel restrictions, the agencies have determined the "rights or obligations" of foreign nationals, with immediate "legal consequences." Bennett , 520 U.S. at 178, 117 S.Ct. 1154. "[S]ubject to exceptions and waivers," nationals of the Designated Countries will be denied immigrant and certain nonimmigrant visas. State Department Statement, supra . And the implementation of this policy is not "tentative" or "interlocutory." Franklin , 505 U.S. at 797, 112 S.Ct. 2767. To the contrary, a final decision has been made to upend the normal individualized vetting process. Covered nationals are now categorically inadmissible-and their visa applications will be categorically rejected-unless they meet the high standard for waiver not applicable to citizens from non-Designated Countries. State Department Statement, supra ; see also Hawkes , 136 S.Ct. at 1815.
The Government's argument that Plaintiffs' relatives must be denied visas and waivers before they can sue under the APA is a red herring. Plaintiffs do not seek a substantive declaration that their relatives will be issued visas and admitted to the country-the issuance of visas and the admissibility of foreign nationals is subject to the many limitations established by Congress in the INA and to the discretion of consular officials. 8 U.S.C. §§ 1104(a)(1), 1201 ; 6 U.S.C. § 236(b)(1). Instead, Plaintiffs merely ask that their relatives go through the same individualized vetting process that the Executive Branch applies to nationals from all other countries-an individualized vetting process that has already been denied them *286 because of the agencies' final decision to implement the Proclamation's travel restrictions. See McNary , 498 U.S. at 495, 111 S.Ct. 888.
Third, Plaintiffs have satisfied the APA's injury requirement. Plaintiffs can only sue under the APA if they are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under this standard, the interests they assert "must be arguably within the zone of interests to be protected or regulated by the statute" that they say was violated. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak , 567 U.S. 209, 224, 132 S.Ct. 2199, 183 L.Ed.2d 211 (2012) (internal quotation marks and citation omitted); accord Lexmark , 134 S.Ct. at 1389 ; Lujan , 497 U.S. at 883, 110 S.Ct. 3177. Consistent with "Congress's evident intent when enacting the APA to make agency action presumptively reviewable," the Supreme Court has held that this standard "is not meant to be especially demanding." Patchak , 567 U.S. at 225, 132 S.Ct. 2199 (citation omitted). The "conspicuous[ ]" inclusion of the word "arguably" indicates "that the benefit of any doubt goes to the plaintiff." Id. Indeed, the APA "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id. (internal quotation marks and citation omitted).
The Government argues that Plaintiffs fall outside of § 702 because the INA does not confer on them "any legally cognizable rights" nor "protect any interest of organizations that merely provide services to aliens seeking entry." First Br. 24. But the APA does not "require any indication of congressional purpose to benefit the would-be plaintiff." Patchak , 567 U.S. at 225, 132 S.Ct. 2199 (internal quotation marks and citation omitted). Nor are Plaintiffs' interests "marginally related to or inconsistent with the purpose implicit" in the INA. Id. The INA manifests a clear interest in preserving the family unit, an interest shared by the individual Plaintiffs and the associational Plaintiffs with affected members. See, e.g. , 8 U.S.C. §§ 1151(b)(2), 1153(a) ; see also LAVAS , 45 F.3d at 471-72 ("In originally enacting the INA, Congress implemented the underlying intention of our immigration laws regarding the preservation of the family unit." (citation and brackets omitted) ); William A. Kandel, Cong. Research Serv., R43145, U.S. Family-Based Immigration Policy 1-3 (2016). The INA also provides for visas for foreign nationals traveling to the United States for business and education, including to "[c]onsult with business associates" and "[p]articipate in ... educational, professional, or business conventions, conferences, or seminars." Dep't of State, 9 Foreign Affairs Manual § 402.2-5(B); see 8 U.S.C. § 1101(a)(15)(B). These interests coincide with the interests of MESA, IAAB, and IRAP, all of which are planning meetings and conferences to be attended by foreign nationals from the Designated Countries. IRAP v. Trump , 265 F.Supp.3d at 597-98 ; see Abourezk , 785 F.2d at 1047, 1050-51 (finding that organizations that had invited foreign nationals to "attend meetings or address audiences" in the United States were within the zone of interests of the INA). I find that the individual and organizational Plaintiffs easily clear this bar.
Finally, the challenged agency actions are not "committed to agency discretion by law." See 5 U.S.C. § 701(a)(2). The APA bars review if "a court would have no meaningful standard against which to judge the agency's exercise of discretion" because the statute has " 'committed' the decisionmaking to the agency's judgment absolutely."
*287 Heckler v. Chaney , 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). But, under the APA, Plaintiffs are challenging the agencies' implementation of the Proclamation's travel restrictions. The agencies have no discretion to ignore or modify the travel restrictions, exceptions, and waiver procedures detailed in the Proclamation.
To the extent that the agencies are drawing their authority directly from the INA, Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162 ("This is to inform you that a consular officer found you ineligible for a visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation 9645."), I also find that § 1182(f) does not confer unreviewable discretion. Congress knew how to commit decisions in the INA to unreviewable agency discretion-and it chose not to do so in § 1182(f). Compare 8 U.S.C. § 1182(f) ("[The President] may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."), with 8 U.S.C. §§ 1182(a)(10)(C)(ii)(III) (committing a decision to the Secretary of State's "sole and unreviewable discretion"), 1182(a)(10)(C)(iii)(II) (same), 1182(d)(3)(B)(i) (same), 1182(d)(12) (committing a decision to the "discretion" of the Attorney General), 1182(h) (same), 1182(i) (same); cf. Dalton v. Specter , 511 U.S. 462, 476, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) (finding presidential action taken pursuant to statute that did "not at all limit the President's discretion" unreviewable).
2.
This Court also has inherent authority to review allegations that an executive action has exceeded the Constitution or a congressional grant of authority. See, e.g. , Armstrong v. Exceptional Child Ctr., Inc. , --- U.S. ----, 135 S.Ct. 1378, 1384, 191 L.Ed.2d 471 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); Dames & Moore v. Regan , 453 U.S. 654, 670-73, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (reviewing claims that executive action exceeded statutory and constitutional powers); Reich , 74 F.3d at 1327-32 (concluding that plaintiffs can bring "non-statutory review action," and courts have authority to review executive action that violates statutory commands).
Judicial review of executive action alleged to exceed statutory grants of authority is inherent in the separation of powers established by the Founders. In Chadha , the Supreme Court struck down a provision of the INA giving one branch of Congress a legislative veto over individual Executive Branch decisions to keep deportable foreign nationals in the country. 462 U.S. at 923, 959, 103 S.Ct. 2764. The Court rejected an argument that the legislative veto was necessary to check executive lawmaking. Id. at 953, 103 S.Ct. 2764 n.16. In our tripartite system of government, "bicameral process is not necessary as a check on the Executive's administration of the laws because his administrative activity cannot reach beyond the limits of the statute that created it." Id. Rather, "when a case or controversy arises, [the courts] can always 'ascertain whether the will of Congress has been obeyed,' and can enforce adherence to statutory standards." Id. (quoting Yakus v. United States , 321 U.S. 414, 425, 64 S.Ct. 660, 88 L.Ed. 834 (1944) ) (citing Youngstown Sheet & Tube Co. v. Sawyer , 343 U.S. 579, 587, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ). Executive action *288 taken pursuant to legislatively delegated authority "is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely." Id.
Moreover, the Supreme Court has recognized a "strong presumption" that "Congress intends judicial review of administrative action." E.g. , McNary , 498 U.S. at 496, 111 S.Ct. 888 ; Bowen , 476 U.S. at 670, 106 S.Ct. 2133. Because the Court presumes "that Congress intends the executive to obey its statutory commands," the Court ordinarily presumes that Congress also "expects the courts to grant relief when an executive agency violates such a command." Bowen , 476 U.S. at 681, 106 S.Ct. 2133.
As a result, the Supreme Court and other courts have repeatedly recognized the judiciary's role in reviewing executive action for compliance with statutory authority. In American School of Magnetic Healing v. McAnnulty , for example, the Supreme Court held that the Postmaster General had exceeded his statutory authority by prohibiting the delivery of mail to a certain business. 187 U.S. 94, 110, 23 S.Ct. 33, 47 L.Ed. 90 (1902). The Court concluded that the courts "must have power in a proper proceeding to grant relief." Id. "Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." Id. at 110, 23 S.Ct. 33. Three decades later, in Lloyd Sabaudo Societa Anonima Per Azioni v. Elting , the Court considered a steamship company's challenge to fines imposed by the Secretary of Labor as violating the then-extant Immigration Act. 287 U.S. 329, 335-36, 53 S.Ct. 167, 77 L.Ed. 341 (1932). The company had unlawfully brought to the United States foreign nationals deemed inadmissible by the Secretary. In recognition of the discretion Congress had given to the Secretary to determine the admissibility of certain foreign nationals, the Court declined to review the fines for abuse of discretion. Id. at 334, 53 S.Ct. 167. But the Court did recognize that the Secretary's action was "subject to some judicial review," including to "determine whether his action [wa]s within his statutory authority" and "whether there was any evidence before him to support his determination." Id. at 335-36, 53 S.Ct. 167 ; see also Harmon v. Brucker , 355 U.S. 579, 581-82, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) (holding that district court has "power to construe the statutes involved to determine whether the [Secretary of the Army] did exceed his powers," and that if he did, "judicial relief from this illegality would be available"); Abourezk , 785 F.2d at 1061-62 (holding that executive discretion over admission and exclusion of foreign nationals "extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations"); Patel v. Reno , 134 F.3d 929, 931-32 (9th Cir. 1997) ("[W]hen the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists."); Mulligan v. Schultz , 848 F.2d 655, 657 (5th Cir. 1988) (finding that court can review whether Secretary of State had statutory authority to specify certain dates).
Plaintiffs' challenge to the Proclamation falls within this "familiar judicial exercise." Zivotofsky ex rel. Zivotofsky v. Clinton , 566 U.S. 189, 196, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012). Plaintiffs allege that the Proclamation runs contrary to the INA by exceeding the President's delegated authority under § 1182(f) and § 1185(a) and by violating § 1152(a). A "case or controversy" having arisen, the Court is now *289 obligated to "ascertain whether the will of Congress has been obeyed" and "enforce adherence to statutory standards." Chadha , 462 U.S. at 953 n.16, 103 S.Ct. 2764 (quoting Yakus , 321 U.S. at 425, 64 S.Ct. 660 ).
The Supreme Court's exercise of jurisdiction in Sale , 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128, further supports this conclusion. There, the Court considered the merits of a challenge to Executive Order 12,807, in which the President had invoked his authority under § 1182(f) to order the interdiction of undocumented foreign nationals from the high seas. Id. at 158-59, 164 n.13. The Government argues that Sale lacks precedential effect because the Supreme Court did not explicitly discuss justiciability issues in its opinion. See Lewis v. Casey , 518 U.S. 343, 352 n.2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[T]he existence of unaddressed jurisdictional defects has no precedential effect."). But a case loses precedential effect only when justiciability "was not questioned" and "passed sub silentio." United States v. L.A. Tucker Truck Lines, Inc. , 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (collecting cases). In Sale , the Government challenged the Court's power to hear the case, arguing both in its briefing and at oral argument that the Court lacked jurisdiction and that the plaintiffs had no cause of action under the APA. Br. for U.S. at 13-18 & nn. 7, 9-11 (No. 92-344); Reply Br. for U.S. at 1-4 (No. 92-344); Oral Arg. Tr. at 16-22 (No. 92-344). As a result, Sale was not a "drive-by jurisdictional ruling[ ]," Steel Co. , 523 U.S. at 91, 118 S.Ct. 1003, in which questions of justiciability were "neither challenged nor discussed," Lewis , 518 U.S. at 352 n.2, 116 S.Ct. 2174. Instead, Sale was an affirmative exercise of judicial review to ensure that an executive order complied with the INA. 509 U.S. at 165-66, 113 S.Ct. 2549 ("We must decide only whether Executive Order No. 12,807... is consistent with § 243(h) of the INA."). That the Supreme Court ultimately rejected the plaintiffs' contentions on the merits is irrelevant; it is "readily refuted" that "a court may decide the cause of action before resolving Article III jurisdiction." Steel Co. , 523 U.S. at 95, 118 S.Ct. 1003 (emphasis omitted).
Simply put, the Court does not consider the "wisdom of the policy choices" made by the President. Sale , 509 U.S. at 165, 113 S.Ct. 2549. Instead, "we must decide only whether" the Proclamation, "which reflects and implements those choices, is consistent with" the INA. Id. at 165-66, 113 S.Ct. 2549.[10] And, for that reason, Plaintiffs' statutory claims are justiciable.
II.
The Proclamation has no historical precedent. The President interprets the INA in a way that no other administration has in the statute's sixty-five year existence and attempts to enact, by decree, the type of immigration policy traditionally reserved for Congress. I would hold that the Proclamation *290 exceeds the scope of authority delegated by the INA and that it was unlawfully issued.
The principles at work here are simple and undeniable. First, our Constitution vests power over migration in Congress. See, e.g. , Gibbons v. Ogden , 22 U.S. 1, 16-17, 9 Wheat. 1, 6 L.Ed. 23 (1824). For Congress to delegate the sweeping power that the Proclamation claims, it must do so clearly. See F.D.A. v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 160, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). And, in delegating broad powers, Congress must not give the President "totally unrestricted freedom of choice," as doing so may run afoul of the nondelegation doctrine. See Zemel v. Rusk , 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Finally, were the President to issue the Proclamation without statutory authority, he would likely intrude into the legislative domain and violate the separation of powers. See Youngstown , 343 U.S. at 585-86, 72 S.Ct. 863.
Here, Congress has not clearly delegated the expansive authority that the President seeks, and the powers Congress did delegate contain restraints that have been exceeded in this case. In addition, the Proclamation, as it applies to immigrant visas, directly contravenes the INA's prohibition on nationality discrimination. See 8 U.S.C. § 1152. The Proclamation was therefore issued without statutory authority, and Plaintiffs are likely to succeed in showing that it was unlawful.
A.
As the text of Article I and centuries of legislative practice and judicial precedent make clear, the Constitution vests Congress, not the President, with the power to set immigration policy. Article I of the Constitution vests Congress with plenary power to control the movement of people across the nation's borders. As Chief Justice John Marshall wrote for the Supreme Court in 1824, that authority expressly derives from Congress's "power to regulate commerce with foreign nations." U.S. Const. art. I, § 8, cls. 1 & 3 ; Ogden , 22 U.S. at 16-17 (noting that Art. I, § 9, cl. 1 of the Constitution, which prevented Congress from prohibiting migration or importation of persons until 1808, is exception to Congress's otherwise plenary power over migration). The naturalization clause and implied sovereign and foreign relations powers provide additional sources of authority. Arizona v. United States , 567 U.S. 387, 394-95, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (citing Art. I, § 8, cl. 4); Toll v. Moreno , 458 U.S. 1, 10, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982) (citing both commerce and naturalization clauses).
As a result, Congress controls the classification of aliens and their exclusion, notwithstanding the President's separate foreign affairs powers.[11] "[T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded ... as any aspect of our government." See Galvan v. Press , 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954). Indeed, the Supreme Court "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." Fiallo v. Bell , 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) ; accord Fong Yue Ting v. United States , 149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) ("The power to exclude or to expel aliens ... is *291 to be regulated by treaty or by act of congress...."); Nishimura Ekiu , 142 U.S. at 659, 12 S.Ct. 336. As such, Congress has long created an "extensive and complex" scheme for the categorization and admission of foreign nationals. Arizona , 567 U.S. at 395, 132 S.Ct. 2492.
Once Congress has formulated such policies, the President then enforces removals and exclusions "according to the regulations so established." Fong , 149 U.S. at 713, 13 S.Ct. 1016 ; accord Nishimura Ekiu , 142 U.S. at 659, 12 S.Ct. 336. The President therefore plays a distinct, complementary role in the immigration arena, and any attempt to modify Congress's immigration priorities risks intruding into the legislative domain.[12]
B.
Given that power over immigration policy primarily resides with Congress, the next question is whether the INA clearly delegates the sweeping power to enact the Proclamation in this case. The Proclamation invokes two INA provisions- § 1182(f) and § 1185(a)(1). Section 1182(f) facially authorizes the President to suspend or impose restrictions on "the entry of all aliens or any class of aliens" into the United States if he finds that their entry "would be detrimental" to our national interests. 8 U.S.C. § 1182(f). Meanwhile, § 1185(a)(1) requires "any alien to depart from or enter" the United States "under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. § 1185(a)(1).
The Government argues that these provisions authorize the President to halt any and all foreign travel into the country at any time, from any and all countries, for any reason he decrees, for however long he wishes, notwithstanding any other provision of law. This interpretation of § 1182(f) and § 1185(a)(1) requires a breathtaking delegation to the President of virtually unconstrained power not only to depart from Congress's priorities but to dramatically reorganize the domestic affairs of broad swathes of Americans.
Courts require a clear statement of congressional intent before finding that Congress has ceded decisions of great economic and political significance, including in the immigration arena. King v. Burwell , --- U.S. ----, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015) ; Brown & Williamson , 529 U.S. at 160, 120 S.Ct. 1291 ; Texas v. United States , 809 F.3d 134, 181 (5th Cir. 2015), affirmed by equally divided court , --- U.S. ----, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016). The clear-statement rule guards against unnecessary erosion of separation of powers and political accountability by insisting that the legislature directly confront the benefits and implications of these decisions. Here, the power claimed by the Government, even if not exercised to its full extent, is at least as broad as it was in cases where courts have applied the major questions canon. See Brown & Williamson , 529 U.S. at 137-43, 160, 120 S.Ct. 1291 ; Texas , 809 F.3d at 181.
To be sure, delegations of power to the President, rather than an agency, may raise lesser separation-of-powers concerns because the President undoubtedly decides questions of great significance as the chief executive. But the President does not, within the confines of the Constitution, *292 decide major questions that are within the legislative function. Indeed, conferral of unrestrained discretion on the President can be particularly dangerous for several reasons.
First, the President is not subject to the procedures that constrain legislative and administrative decision-making. Congress, given its bicameral structure, provides a different kind of safeguard against government overreach. See The Federalist No. 70 (Alexander Hamilton) (explaining that Congress is "best adapted to deliberation and wisdom, and best calculated to conciliate the confidence of the people and to secure their privileges and interests"). The legislative process is then less prone to "the impulse of sudden and violent passions, and to be seduced by factious leaders into intemperate and pernicious resolutions." The Federalist No. 62; see also Hamdan v. Rumsfeld , 548 U.S. 557, 637, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Kennedy, J., concurring in part) ("Respect for laws derived from the customary operation of the Executive and Legislative Branches gives some assurance of stability in time of crisis. The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment.").
Second, rescinding the President's discretion, once granted, is not a simple task. It almost certainly requires a veto-proof supermajority-even though a simple majority of Congress may have delegated the authority. Therefore, courts should not readily assume that a co-equal branch of government has ceded control over questions of monumental significance. Rather, Congress must effectuate broad delegations with statements of commensurate clarity.
Sections 1182(f) and 1185(a)(1) do not contain that requisite clarity. As the Supreme Court has held, "oftentimes the 'meaning-or ambiguity-of certain words or phrases may only become evident when placed in context.' " Burwell , 135 S.Ct. at 2489 (quoting Brown & Williamson , 529 U.S. at 132, 120 S.Ct. 1291 ). The two provisions may appear to confer broad discretion when read in isolation but not when read in context or when compared to other statutory provisions that confer discretion on the President. See United States v. Witkovich , 353 U.S. 194, 199, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957) (explaining that broadly worded immigration statutes should not be read "in isolation and literally" to confer "unbounded authority").
If, as the Government argues, § 1182(f) and § 1185(a)(1) confer discretion to halt any and all travel, one would expect the provisions' text to describe the President's power in the broadest terms. But such language is noticeably absent. The INA, including § 1182, and other statutes are replete with examples of far broader delegations of discretion. Section 1182(a)(9)(B)(v), for instance, commits an immigration waiver decision to the "sole discretion" and "satisfaction" of the Attorney General. See also, e.g. , 8 U.S.C. §§ 1182(a)(5)(C)(iii), 1182(a)(10)(C)(ii)(III), 1182(a)(10)(C)(iii)(II), 1182(d)(3)(B)(i). Congress has also used similar language to delegate broad discretion to the President in other contexts. See, e.g. , 6 U.S.C. § 485(f)(1), (g)(1) ("at the sole discretion of the President"); 22 U.S.C. § 1631a(c) ("within the sole discretion of the President"). Thus, Congress demonstrably knows how to confer maximum discretion but has not done so here.
For those reasons, I conclude that § 1182(f) and § 1185(a)(1) do not clearly confer the broad authority that the Government claims.
C.
Having determined that the grant of authority under § 1182(f) and § 1185(a)(1)
*293 is not as broad as the Government claims, the next question is the actual scope of the powers they delegate-and whether the Proclamation falls within that scope. The proper construction of seemingly broad delegations of unrestrained discretion must be informed by the constitutional avoidance canon and its specific subspecies, the nondelegation canon. Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst. , 448 U.S. 607, 646, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality). The Supreme Court has repeatedly "read significant limitations into ... immigration statutes in order to avoid their constitutional invalidation." Zadvydas v. Davis , 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ; see, e.g. , Kent v. Dulles , 357 U.S. 116, 129-30, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (limiting facially broad delegation and declining to "infer that Congress gave ... unbridled discretion to grant or withhold" passports); Witkovich , 353 U.S. at 199, 77 S.Ct. 779 ; The Japanese Immigrant Case , 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903).
The constitutional concern here is that the Government's interpretation of the INA effectuates "such a 'sweeping delegation of legislative power' that it might be unconstitutional." See Indus. Union Dep't, AFL-CIO , 448 U.S. at 646, 100 S.Ct. 2844. "A construction of the statute that avoids this kind of open-ended grant should certainly be favored." See id . ; see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council , 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").
When broad power is delegated with few or no constraints, the risk of an unconstitutional delegation is at its peak. Whitman v. Am. Trucking Ass'ns , 531 U.S. 457, 474-75, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). As the Supreme Court held in Whitman , "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."[13] Id . at 475, 121 S.Ct. 903. Therefore, whether a delegation is unconstitutional depends on two factors-the amount of discretion and the scope of authority.
First, the Government's construction confers unlimited discretion on the President. Not only are his decisions unreviewable, there are in fact no substantive limitations-all that is required is an order reciting "the interests of the United States." First Br. 30. And even that may be unnecessary because, according to the Government, § 1185(a) does not require findings. To be sure, courts are more tolerant of broad delegations involving foreign affairs. See United States v. Curtiss-Wright Exp. Corp. , 299 U.S. 304, 319-20, 57 S.Ct. 216, 81 L.Ed. 255 (1936). But, even assuming the INA provisions concern foreign policy, "[t]his does not mean that ... [they] can grant the Executive totally unrestricted freedom of choice."[14]
*294 Zemel , 381 U.S. at 17, 85 S.Ct. 1271 ; accord Dulles , 357 U.S. at 129, 78 S.Ct. 1113. Yet there can be no greater freedom of choice than what the Government claims.[15]
Second, the authority that § 1182(f) and § 1185(a)(1) purportedly delegate is exceedingly broad in scope. At bottom, the "Government argues that the President, at any time and under any circumstances, could bar entry of all aliens from any country" indefinitely. Hawai'i v. Trump , 878 F.3d at 680 n.6. In 2016, the United States issued 617,752 immigrant visas and another 10,381,491 nonimmigrant visas to temporary visitors. Dep't of State, Table I Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts Fiscal Years 2012-2016 (saved as ECF opinion attachment 3).[16] The Government therefore would have the Court conclude that Congress delegated the authority to decimate, at minimum, numerous industries that depend on foreign labor or revenue; to prevent universities and employers from recruiting students and employees; and to dramatically upend hundreds of thousands of American families. Even assuming the President never expands the Proclamation, he has already "block[ed] over 150 million people from entering the United States on the basis of their nationality." IRAP v. Trump , 265 F.Supp.3d at 593.
The vast discretion that the INA supposedly delegates to the President and the vast scope of that delegation thus raise nondelegation concerns to their zenith. The Proclamation invokes such broad authority to drastically affect private rights and affairs that it approximates lawmaking. See Chadha , 462 U.S. at 952-55, 103 S.Ct. 2764. Drawing a line between legislative and executive functions can be difficult; the demarcation between the legislature and the executive is necessarily dynamic and can only be truly resolved by the interplay between the branches. But this case presents an easy question because actions akin to the Proclamation have historically been legislative.
Three examples illustrate this point. First, classifying foreign nationals and categorically regulating their entry are legislative acts. See, e.g. , Fiallo , 430 U.S. at 795 n.6, 97 S.Ct. 1473 ("[L]imits and classifications as to who shall be admitted are traditional and necessary elements of legislation in this area."); Nishimura Ekiu , 142 U.S. at 659, 12 S.Ct. 336 ("[C]ongress has often passed acts forbidding the immigration of particular classes of foreigners."). Indeed, Congress has enacted and since repealed statutes that ban foreigners based on nationality. The most analogous examples are the Chinese Exclusion Act and nationality-based quota system. The *295 Chinese Exclusion Act barred for ten years (and later indefinitely) the entry of Chinese migrants to this nation based on the judgment that their presence would be detrimental to "the good order" of the United States. The Chinese Exclusion Act, Pub. L. No. 47-126, 22 Stat. 58, 58-61 (1882).[17] The quota system, first enacted in 1924, imposed different restrictions based on nationality. Immigration Act of 1924, Pub. L. No. 68-139, 43 Stat. 153. Although the last remnants of these laws were repealed in 1965, the Proclamation mirrors their likeness.
Second, the Government's interpretation of § 1182(f) and § 1185(a)(1) authorizes the President to prevent significant portions of the INA from having any effect, indefinitely, unless contrary legislation is enacted-an action that bears similarities to the unconstitutional line item veto. As discussed infra , the 1965 amendments to the INA prohibit a nationality-based immigration policy and provide for individualized visa-eligibility determinations for family members. See, e.g. , 8 U.S.C. §§ 1151(b), 1152(a). Those provisions would be subject to suspension by the President at will. Unlike individual visa waivers, for example, the Proclamation creates rules of future and general application and decides for whom the INA shall not apply. The potential permanence of proclamations, combined with the effective suspension of an enacted statute, approximates the line item veto that the Supreme Court struck down as unconstitutional executive lawmaking.[18] See Clinton v. City of New York , 524 U.S. 417, 443-46, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998).
Finally, the type of presidential power claimed here is similar to what the Supreme Court and Justice Jackson cautioned against and rejected in Youngstown . There, the Supreme Court held that the President could not, by invoking his commander-in-chief powers, resolve labor disputes through seizure of property because Congress was vested with the power to do so and had previously rejected similar legislation. 343 U.S. at 586-88, 72 S.Ct. 863. Here, the President similarly attempts to reorganize domestic affairs by employing nationality discrimination, a method already rejected by Congress. The Youngstown Court also rejected the Government's argument that actions with such *296 significant effects on the domestic sphere could be justified by an amalgam of the President's powers to faithfully execute the laws: "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." Id.
In sum, the President claims the authority to indefinitely set his own immigration and travel policies with respect to every foreign nation and class of immigrants, under any circumstances, exigent or not, that he sees fit. Such authority is dangerously similar to lawmaking and intrudes on Congress's plenary power over immigration. While courts rarely strike down laws on nondelegation grounds, courts "vindicate the constitutional principle against delegation of legislative authority" by "narrowly construing grants of policymaking power." Cass R. Sunstein, Interpreting Statutes in the Regulatory State , 103 Harv. L. Rev. 405, 470 (1989). Therefore, to the extent permissible, § 1182(f) and § 1185(a)(1) must be construed to provide some constraint on the President's discretion.
1.
I turn first to § 1182(f) and conclude that its proper construction avoids serious constitutional concerns. Read in light of statutory context and historical practice, § 1182(f) is a gap-filling provision that empowers the President to exclude (1) foreign nationals whose individual conduct or affiliation makes their entry harmful to national interests for reasons unanticipated by Congress and (2) foreign nationals in response to a foreign-affairs or national-security exigency. For the reasons below, I conclude that the Proclamation, with the exception of Venezuela, does not fill any gaps left by Congress and that Plaintiffs are likely to prevail in showing that it exceeds the authority granted by § 1182(f).
a.
The structure of § 1182 reveals limitations on the President's discretion. Section 1182(f) is a general provision that follows a list of individual-specific bars to entry, all of which are carefully cabined and defined. See Panama Ref. Co. v. Ryan , 293 U.S. 388, 416, 55 S.Ct. 241, 79 L.Ed. 446 (1935) (examining whether other provisions of section "afford ... ground for implying a limitation of the broad grant of authority"). In light of this structure, § 1182(f) is a residual or gap-filling provision that addresses circumstances not specifically dealt with by Congress.
Section 1182 begins, in subsection (a), by defining "classes of aliens" ineligible for visas or admission in great detail. Specific subsections bar immigrants who pose security risks, have engaged in "terrorist activities," or are otherwise associated with terrorist organizations. 8 U.S.C. § 1182(a)(3)(A), (B), (F). Another authorizes exclusion of individuals whose entry may have "serious adverse foreign policy consequences." 8 U.S.C. § 1182(a)(3)(C). And yet another provision, enacted as part of the International Religious Freedom Act, makes international free exercise a priority in U.S. foreign policy and bars entry of foreign officials who have suppressed religious freedom. 8 U.S.C. § 1182(a)(2)(G) ; Pub. L. No. 105-292, § 604, 112 Stat. 2787, 2814.
Under ordinary principles of statutory construction, "the specific governs the general." RadLAX Gateway Hotel, LLC v. Amalgamated Bank , 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012) (internal quotations, citations, and alterations omitted). "That is particularly true where ... Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." Id.
*297 Our nation's immigration law, and § 1182 in particular, is the quintessential comprehensive scheme. Arizona , 567 U.S. at 395, 132 S.Ct. 2492. Because § 1182(f) contains general language that follows more specific provisions, it is a residual provision that addresses circumstances similar to but not already addressed by the more specific paragraphs. See Abourezk , 785 F.2d at 1049 n.2 ("The President's ... power [under § 1182(f) ] provides a safeguard against the danger ... that is not covered by one of the categories in § 1182(a).").
Therefore, for circumstances already addressed by the specific provisions of § 1182, the President must implement Congress's express directives, according to the procedures set forth by statute. See D. Ginsberg & Sons v. Popkin , 285 U.S. 204, 207-08, 52 S.Ct. 322, 76 L.Ed. 704 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."). Where Congress has intended for executive action to be unconstrained by other limitations, it has expressly authorized action "notwithstanding any other provision of law." See, e.g. , 8 U.S.C. § 1182f ; 11 U.S.C. § 1123. Congress has not done so here. Simply stated, a residual power cannot rewrite a statute's overall framework. See MCI Telecommunications Corp. v. Am. Tel. & Tel. Co. , 512 U.S. 218, 228-29, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (holding that power to modify does not encompass fundamental changes to statutory scheme).
b.
How other Presidents have understood and used § 1182(f) further confirms its intended gap-filling function. Section 1182(f) has been in place since 1952, spanning twelve presidencies. See Immigration & Nationality Act of 1952, Pub. L. No. 82-414, § 212(e), 66 Stat. 163, 188. No other administration has ever claimed the power sought by the Government today. Every other order issued under § 1182(f) has (1) targeted individuals whose personal conduct or characteristics are harmful to our nation's interests or (2) responded to discrete crises and exigent circumstances. And, without exception, Presidents have avoided blanket nationality bans and exempted family members of Americans. But, here, the Proclamation departs from Congress's individualized scheme in favor of a multi-nation ban absent any demonstrated exigency. I decline the invitation to dramatically expand authority delegated by a long-existing statute far beyond all historical understanding and practice. See Util. Air Regulatory Grp. v. EPA , --- U.S. ----, 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014) (disfavoring "claims to discover in a long-extant statute an unheralded power").
When faced with seemingly broad grants of discretion, courts routinely use historical practice to define the contours of the delegation. See, e.g. , Dulles , 357 U.S. at 128, 78 S.Ct. 1113 ; Abourezk , 785 F.2d at 1053. In Dulles , the Supreme Court confronted the "difficulty" of interpreting an immigration statute that seemingly granted broad discretion, using language similar to § 1182(f),[19] but that had also been "long exercised quite narrowly." 357 U.S. at 127-28, 78 S.Ct. 1113. The Dulles Court declined to expand the authority *298 granted under the INA beyond the scope of its historical usage, despite the existence of a declared national emergency. Id. at 122, 129-30, 78 S.Ct. 1113. Instead, the Court limited the executive's authority to deny passports to two categories of applicant misconduct based on historical practice. Id. at 128, 130, 78 S.Ct. 1113.
Looking to historical practice here, it becomes clear that prior orders issued under § 1182(f) 's seemingly broad terms have exclusively responded to Congress's institutional limitations. See J.W. Hampton, Jr., & Co. v. United States , 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928) ("In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination.").
First, Congress cannot reasonably anticipate and enumerate every type of individual conduct that is harmful to national interests. Accordingly, the vast majority of § 1182(f) orders have targeted individual conduct similar to but beyond what Congress has expressly provided in § 1182. See Kate M. Manuel, Cong. Research Serv., R44743, Executive Authority to Exclude Aliens: In Brief 6-12 (2017). For instance, President Obama suspended the entry of individuals who have "contributed" to the lack of peace and stability in Libya, individuals who have specified connections with the North Korean government, individuals who have engaged in certain conduct with Iran and Syria (such as facilitating deceptive transactions), and individuals who have undermined democratic institutions and human rights in Venezuela. Id. Similarly, President George W. Bush barred those who threatened Zimbabwe's democratic institutions and those who engaged in acts of public corruption. Id. President Clinton banned those who oppressed civilians in Kosovo, enlisted in the Sudanese armed forces, or impeded Haiti's transition to democracy. Id. President Reagan suspended entry of officers of the Nicaraguan government and directed the interdiction of vessels carrying undocumented immigrants on the high seas. Id. Unlike the current ban, which relies on the nearly immutable status of nationality, the overwhelming majority of individuals banned under § 1182(f) to date are foreign nationals whose personal conduct or affiliation may be harmful to national interests.
Second, Congress must necessarily confer some discretion on the President to act in response to exigent circumstances. Only two executive actions have imposed broad bans, and both occurred in response to foreign affairs crises. Even then, both fell well-short of banning all immigrants. President Carter authorized the revocation and denial of Iranian visas after the Iranian government took U.S. embassy officials hostage, but exempted (1) asylum seekers, (2) Iranians closely related to an American, and (3) Iranians in need of immediate medical attention.[20] Similarly, President *299 Reagan barred Cuban nationals after Cuba breached its immigration agreement but exempted the immediate relatives of Americans. Proclamation No. 5517, 51 Fed. Reg. 30,470, 30,470 (Aug. 26, 1986).
These two orders involved quintessential exigencies that Congress did not foresee and that required immediate reprisals. Given that the President can act much more rapidly in responding to foreign crises, congressional delegation of discretion under those circumstances is necessary to serve important sovereign interests. And, when there is an exigency, courts tolerate broader delegations as "inherent necessities of ... governmental co-ordination." See Hampton , 276 U.S. at 406, 48 S.Ct. 348 ; accord Dulles , 357 U.S. at 138-39, 78 S.Ct. 1113 (distinguishing peacetime from wartime). "[B]ut it is the emergency ... that gives the right, and it is clear that the emergency must be shown to exist before the [action] can be justified." See United States v. Russell , 80 U.S. 13 Wall. 623, 628, 20 L.Ed. 474 (1871).
Changes to the INA and the evolution of § 1182(f) 's usage over time confirm that § 1182(f) serves a gap-filling function. Indeed, history shows that § 1182(f) grew to encompass exigent circumstances as those gaps manifested over the past century. After World War II, Congress expressly authorized the President to impose, during declared national emergencies, additional entry requirements beyond what Congress had otherwise prescribed. Immigration & Nationality Act of 1952 § 215(a), 66 Stat. at 190 (codified as amended at 8 U.S.C. § 1185(a) ). However, in 1978, Congress deleted the language authorizing the President to impose additional entry requirements during a war or other national emergency. Foreign Relations Authorization Act, Pub. L. No. 95-426, § 707, 92 Stat. 963, 992-93 (1978). Having apparently lost the statutory authority to restrict entry during national emergencies under § 1185(a), Presidents, beginning with President Reagan in 1981, started invoking § 1182(f) for that purpose instead. See Manuel, supra (chronicling all categories of aliens excluded under § 1182(f) ). Therefore, from the outset, § 1182(f) has filled particular gaps, specifically those created by Congress in its 1978 amendment.
In sum, judicial precedent disfavors dramatic expansions of authority delegated under old statutes. Even if § 1182(f) authorizes additional entry restrictions beyond those specified by Congress, courts should confine that delegated authority, as did the Supreme Court in Dulles , to two categories: (1) foreign nationals whose personal conduct or characteristics make their entry harmful to national interests for reasons unanticipated by Congress and (2) foreign nationals barred in response to a demonstrated exigency. See 357 U.S. at 128, 130, 78 S.Ct. 1113 ; see also Util. Air , 134 S.Ct. at 2444.
c.
Having determined that § 1182(f) is a gap-filling function, the question is whether the Proclamation fits within the two identified gaps. Because Congress has already legislated in response to the Proclamation's stated purposes, the President, in the absence of exigent circumstances, has *300 exceeded his residual power in this case, except as to restrictions on Venezuelan officials.
As discussed supra , the first gap consists of individuals whose personal conduct or circumstance renders their entry harmful to U.S. interests for reasons unanticipated by Congress. The restrictions against Venezuela are the only ones that fall within this category. The Proclamation does not exclude Venezuelan nationals en masse but instead sanctions individuals "who are responsible for the identified inadequacies," such as officials who refuse to receive deportees. 82 Fed. Reg. at 45,166. Like the overwhelming majority of past exclusionary orders, these restrictions fit comfortably within the practice of excluding persons on the basis of their individual conduct or circumstance. But the blanket nationality ban on the remaining countries cannot fit within this category.
The second gap consists of individuals and classes of individuals barred in response to exigent circumstances. In this case, there is no apparent exigency justifying immediate, categorical exclusion of foreign nationals from the Designated Countries.[21] The Proclamation cannot be responding to an exigency because it does not identify any new event or factual circumstance that Congress has not already considered via legislation. Indeed, the Proclamation represents the administration's attempt to second-guess Congress's judgment by expressly reviewing the same criteria that Congress already identified and examined. 82 Fed. Reg. at 45,163 (citing 8 U.S.C. § 1187 ). Under § 1187, Congress set forth electronic passport and other information-sharing criteria that, when met, exempts foreign nationals from certain documentation requirements. When countries fail to meet these criteria, their citizens are not excluded by the statute-they are merely denied the convenience of entering the United States without a visa. The President, quite simply, attempts to convert what Congress designated as qualifications for special privileges into general criteria for entry. Absent some new circumstance unanticipated by Congress or a demonstrated exigency, the broad and unrestrained power that the Government asserts under the Proclamation is unavailable.
In sum, the President attempts to do more than what Congress has specifically authorized, in response to scenarios that Congress has already foreseen and addressed, without complying with the detailed framework and priorities that Congress has prescribed, in the absence of exigent circumstances justifying expansive executive authority. It makes little sense for Congress to delineate clear circumstances and processes for excluding individuals but then delegate, ambiguously, to the President the power to exclude people en masse without the same procedural rigor unless there is an exigent need for immediate action. See Gonzales v. Oregon , 546 U.S. 243, 262, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). Since the current ban exceeds the bounds of the residual categories *301 refined by history and necessity, I decline to expand a long-existing statute and instead conclude that the Proclamation was issued without congressional authorization under § 1182(f), except as to Venezuela.
2.
I now examine whether the Proclamation is authorized by § 1185(a)(1). Section 1185(a)(1) makes it "unlawful" "for any alien to depart from or enter ... the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."[22] Nondelegation concerns are even greater under § 1185(a)(1) because of its broader application to departure, as well as entry. For the reasons below, I conclude that § 1185(a)(1) does not come close to sustaining the Proclamation. Read in context, it prohibits entry and departure without a passport or other documentation and authorizes reasonable requirements pertaining to travel documentation and other related travel procedures. A nationality requirement is beyond its scope because travelers cannot reasonably comply with it.
As with § 1182(f), the discretion § 1185(a)(1) grants is informed by its statutory context. See Burwell , 135 S.Ct. at 2489. Section 1185(a)(1) is a general provision, whereas subsections (2)-(7) specifically prohibit fraud, tampering, and other misuse of travel documents and applications. Other subsections within § 1185 also pertain to possession of travel documents. Read in context, § 1185(a)(1) is at best a residual provision that enables the President to issue reasonable rules pertaining to travel documents and related administrative processes-similar to its adjacent subsections. A provision regulating fraudulent acts and other tampering with travel procedures clearly does not confer the discretion to shut down travel en masse . See MCI , 512 U.S. at 231-32, 114 S.Ct. 2223 (requiring that delegation of authority to fundamentally alter statutory scheme be clearly expressed); see also 124 Cong. Rec. 15756 (statement by author of 1978 amendment to § 1185 that the "thrust of my amendment is to facilitate travel, not to obstruct it").
The legislative evolution of § 1185 confirms that the President's authority is limited to reasonable regulation of travel documents to prevent fraud and other abuse by individuals. In 1952, § 1185 was titled "Travel Control of Aliens and Citizens in Time of War or National Emergency." Immigration & Nationality Act of 1952 § 215. In 1978, Congress specifically amended § 1185 by renaming it, "Travel Documentation of Aliens and Citizens." Foreign Relations Authorization Act § 707(e).
As the change in title would suggest, Congress made several changes in 1978 that narrowed the type of restrictions that the President could impose but expanded it temporally to encompass peacetime. The 1952 version of § 1185(a)(1) had provided that
When the United States is at war or during the existence of any national emergency proclaimed by the President ... and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the *302 departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or the Congress, be unlawful-
(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe....
Immigration & Nationality Act of 1952 § 215. The 1978 amendment removed several requirements that cabined when the President could act, including requirements that he use § 1185 only during the existence of war or national emergency in the national interest and pursuant to a public proclamation. Foreign Relations Authorization Act § 707. But, at the same time, Congress stripped the President of authority to impose "restrictions and prohibitions in addition to those provided ... by this section." Id. These changes create the inference that Congress broadened the temporal application of § 1185 to non-exigent circumstances while at the same time narrowing the President's authority to impose additional restrictions on entry and departure.
Section 1185(a)(1) also is not as broad as the Government claims because it applies to foreign nationals both inside and outside the United States. Reading § 1185(a)(1) expansively would raise not only nondelegation concerns but also questions under the Fifth Amendment.[23] That the Proclamation in its current form only reaches entry but not exit is immaterial because § 1185 makes no distinction between the two as it pertains to the President's authority. See Brown & Williamson , 529 U.S. at 139-42, 120 S.Ct. 1291. If the Government were correct that § 1185(a)(1) authorizes the exclusion of foreign nationals at the sole discretion of the President, § 1185(a)(1) must also authorize restricting the ability to depart solely on the basis of nationality or whatever criterion that the President chooses.
Section 1185(a)(1) is properly read as authorizing only "reasonable" travel requirements to preserve the integrity of entry and departure documents and procedures. Congress, in making it "unlawful" for individuals to violate the President's "reasonable" processing requirements, must have presupposed the ability of would-be travelers to reasonably comply with them. 8 U.S.C. § 1185(a)(1).
Categorically stripping individuals of their right to travel based on criteria outside of their control, such as nationality, cannot be said to be a reasonable administrative requirement. See Aptheker v. Sec'y of State , 378 U.S. 500, 507, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (holding that executive cannot make freedom of travel of citizens contingent on abandonment of disfavored association). A nationality-based ban therefore exceeds the authority delegated under § 1185(a)(1) because travelers have no plausible means of compliance.
*303 Although some of the baseline criteria employed by the global review are arguably related to preserving the integrity of travel documents and procedures, the Proclamation does not exclude individuals who, for example, failed to obtain an electronic passport. Instead, nationality is the determinative criterion. For instance, according to the Proclamation, Somalia meets the criteria for information sharing and electronic passports but is nonetheless subject to entry restrictions. 82 Fed. Reg. at 45,165 -67. Furthermore, as many as eighty-six countries fail to use electronic passports, the overwhelming majority of which are not targeted by the Proclamation.[24] Those arguably administrative requirements simply do not correspond to the operation of the Proclamation and the people subject to it. It is then apparent that the Proclamation makes nationality a new substantive requirement for travel-beyond the scope of § 1185(a)(1).[25] See Dulles , 357 U.S. at 123, 129, 78 S.Ct. 1113.
In sum, I decline to read § 1185(a)(1) as conferring unbridled discretion on the President to restrict travel on the basis of nationality. Such an expansive interpretation is inconsistent with the text, structure, and history of the statute and may authorize infringement of protected constitutional rights. See Dulles , 357 U.S. at 129, 78 S.Ct. 1113 ("Since we start with an exercise ... of an activity included in constitutional protection, we will not readily infer that Congress gave ... unbridled discretion to grant or withhold it."). Section 1185(a)(1) does not authorize the Proclamation because a nationality requirement is not an administrative rule with which travelers can reasonably comply.
D.
Next, Plaintiffs argue in the alternative that the President's authority under § 1182(f) and § 1185(a)(1) is independently constrained by § 1152(a)(1) 's prohibition against nationality discrimination in the issuance of visas. Section 1152(a)(1), provides that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race ... nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1). This later-enacted and more specific provision restricts the President's authority to issue the Proclamation, which in practice denies visas on the basis of nationality.
Congress enacted § 1152(a)(1) as part of a comprehensive revision of the INA "at the height of the civil rights movement." IRAP v. Trump , 857 F.3d 554, 626 (4th Cir. 2017) (Wynn, J., concurring). The overhaul had "the express purpose of 'eliminat[ing] the national origins system as the basis for the selection of immigrants to the United States.' " Id. (quoting H.R. Rep. 89-745, at 8 (1965) ). In doing so, Congress concluded that nationality-based restrictions are "incompatible with our basic American tradition" and "the principles of equality, of human dignity, and of the *304 individual worth of each man and woman." Id. (citations omitted).
Because § 1152(a)(1) is a more specific and later enacted provision, its prohibition on nationality discrimination controls and limits whatever authority the President has under § 1182(f) and § 1185(a)(1). See RadLAX , 566 U.S. at 648, 132 S.Ct. 2065 ("When the conduct at issue falls within the scope of both provisions, the specific presumptively governs...."); EC Term of Years Tr. v. United States , 550 U.S. 429, 435, 127 S.Ct. 1763, 167 L.Ed.2d 729 (2007) (holding that later statute governs in event of conflict). That § 1152(a)(1) has a list of exceptions, and § 1182(f) and § 1185(a)(1) are not among them, further shows that it cannot be overridden by more general provisions.
The Proclamation, as it applies to immigrants, directly contravenes § 1152(a)(1) and the fundamental principles of equality that it embodies. Despite the Government's efforts to distinguish denial of entry and visa eligibility from visa issuance, the Proclamation operates by categorically denying the issuance of visas. The Proclamation repeatedly refers to visa issuance, and agencies now implement its mandate by categorically denying visas. E.g. , 82 Fed. Reg. at 45,167 ; see also State Department Statement, supra . As the district court rightly concluded, "the Proclamation erases the line between the issuance of a visa and entry into the United States." IRAP v. Trump , 265 F.Supp.3d at 608. Simply stated, the Government cannot evade § 1152(a)(1) simply by characterizing the ban as affecting "entry" or "eligibility." The relevant inquiry is whether the administration is refusing to issue visas based on nationality, and the answer is indisputably in the affirmative.
That Presidents Carter and Reagan have previously imposed entry restrictions on Iran and Cuba respectively does not suggest a contrary interpretation. Presidents Carter and Reagan did not impose blanket restrictions on all immigrants from Iran and Cuba-they exempted, among others, close family members, who were the central focus of the 1965 amendments to the INA.[26] And, to the extent that those two instances are sufficient to establish historical practice and congressional acquiescence, they imply only a narrow exception to § 1152(a)(1) that allows national bans under extraordinary circumstances. As discussed supra , both Presidents were responding to discrete, foreign affairs exigencies that Congress had not yet considered. Congress's arguable acquiescence under those circumstances does not authorize *305 the Proclamation, which does not respond to any exigency or even new development.
Thus, I conclude that Plaintiffs are likely to succeed in showing that the Proclamation operates in contravention of § 1152(a)(1) 's prohibition against nationality discrimination in the issuance of visas.
III.
Absent statutory authorization, there remains the possibility that the President could have enacted the ban using his Article II powers alone. However, unilateral executive action under these circumstances would raise serious separation-of-powers questions. See generally, Youngstown , 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153. Furthermore, the Proclamation specifically invokes the INA and does not assert that the President's inherent powers are independently sufficient to enact the ban. Accordingly, I do not define the outer limits of the President's foreign-affairs powers beyond recognizing the existence of serious constitutional concerns.
Courts apply the well-known Youngstown framework to assess executive power. 343 U.S. at 635-38, 72 S.Ct. 863 (Jackson, J., concurring). The framework creates three categories that measure the President's power based on his relationship with Congress and the extent of congressional approval, acquiescence, or opposition. Id. I also note at the outset that the Proclamation acts within Congress's domain, whether the Government characterizes it as an immigration action or a diplomatic sanction.[27]
The first Youngstown category applies when the President and Congress are acting in concert. Here, his "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." Id. This category does not apply when the President exceeds statutory limits on his authority.
The second Youngstown category applies when Congress is in equipoise. "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority.... Therefore, congressional inertia, indifference or quiescence may sometimes ... enable, if not invite, measures on independent presidential responsibility." Id. at 637, 72 S.Ct. 863. This twilight category therefore applies only if Congress has not already expressed a contrary view via legislation.
Finally, the third Youngstown category applies when the President is contravening congressional intent. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject." Id. at 637-38, 72 S.Ct. 863. Accordingly, this category applies to executive action that has been expressly or impliedly prohibited by Congress.
*306 Because the Proclamation consists of several subparts that impose different restrictions on different countries, the Youngstown framework must be applied at a more granular level than simply evaluating the nature of the Proclamation as a whole.[28] See Ogden , 22 U.S. at 16-17. First, restrictions targeting Venezuelan government officials are in the realm of Youngstown category one because the President properly exercised his authority under § 1182(f). These restrictions therefore raise no constitutional concerns. The remaining restrictions, however, exceed the President's gap-filling authority under the INA; therefore, the question is whether those restrictions fall within Youngstown category two or three.
Because the Proclamation and the INA distinguish between immigrants and nonimmigrants, this analysis must do so as well. As to foreign nationals from the Designated Countries (minus Venezuela) seeking family reunification or other immigrant visas, the Proclamation violates the express will of Congress and therefore falls squarely within Youngstown category three. As discussed supra , § 1152(a)(1) prohibits nationality discrimination in the issuance of immigrant visas. Other provisions of the INA also not only authorize but prioritize family reunification. The President's order, by creating unequal barriers to entry based on nationality and by failing to exempt family members of Americans, directly contravenes Congress's immigration priorities and foreign policy judgment. Under Youngstown category three, courts cannot uphold the President's unilateral action unless Congress has no power in the immigration arena-which is emphatically not the law. See, e.g. , Arizona , 567 U.S. at 409-10, 132 S.Ct. 2492 ; Nishimura Ekiu , 142 U.S. at 659, 12 S.Ct. 336 ; Ogden , 22 U.S. at 16-17.
As to foreign nationals from the seven remaining countries seeking nonimmigrant visas, the Proclamation violates the implied will of Congress and likewise falls within category three. As discussed supra , § 1182(a) and § 1187(a) set forth Congress's specific policy responses to individuals who pose certain risks or who come from countries that fail the Proclamation's baseline criteria. Those are the exclusive responses permitted by Congress absent unanticipated circumstances justifying departure. Since § 1182(f) is a limited gap-filling provision, the INA implicitly confines the circumstances under which that power may be invoked. Since the Proclamation's restrictions on nonimmigrant visas do not fill any gap unaddressed by Congress, they are within Youngstown category three and are of dubious constitutionality.
Indeed, even if the Proclamation's exclusion of nonimmigrants were to fall under Youngstown category two, it is not clear that the Proclamation's restrictions are within the President's Article II powers. No President has ever asserted such unilateral power. Past nationality-related restrictions have invariably relied on statutory authority-even as they affected far fewer nations and fewer individuals and involved a foreign-relations exigency. See Manuel, supra . Presidents Carter and Reagan, for instance, acted in response to foreign affairs that triggered the height of their treaty and diplomat powers. There simply is no precedent for enacting a ban of this size and scope, against this many countries, without either seeking legislative approval or clearly invoking a core Article II power. Indeed, § 1182 and several *307 statutes authorizing exclusions during war or emergency would be entirely redundant if the President already had inherent powers. See, e.g. , Immigration & Nationality Act of 1952 § 215; Pub. L. No. 65-154, ch. 81, 40 Stat. 559, 559 (1918).
Knauff , relied on extensively by the Government and Judge Niemeyer, is not to the contrary. Although Knauff spoke of the President's inherent powers in broad terms, it is inapposite for several reasons. First, the executive was lawfully exercising delegated authority under the wartime precursor to what is now § 1185(a). See Knauff , 338 U.S. at 540-42 & n.1, 70 S.Ct. 309. Accordingly, Knauff 's facts cannot support the proposition that the President has inherent, unilateral power to exclude aliens and set new policies of his own. Second, the Knauff Court evaluated the executive's compliance with two immigration statutes-that entire statutory analysis would be unnecessary if the President wielded broad inherent powers. See id. at 545-47, 70 S.Ct. 309. Third, Knauff was a wartime decision that examined presidential powers at their peak. See id . at 544-45, 70 S.Ct. 309 (emphasizing "national emergency" of World War II); see also Yakus , 321 U.S. at 462, 64 S.Ct. 660 ("War begets necessities ... not required by the lesser exigencies of more normal periods."). But here, the Proclamation does not suggest that our nation is engaged in any hostilities with the Designated Countries,[29] nor does it invoke the President's commander-in-chief powers. Finally, in discussing the President's inherent powers, Knauff relied on and reaffirmed Fong , which had held that "[t]he power to exclude or to expel aliens ... is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so established." See id. at 542-43, 70 S.Ct. 309 (citing Fong , 149 U.S. at 713-14, 13 S.Ct. 1016 ). In other words, no one has identified a single case adopting what would be an astonishing view of inherent executive power.
As the Supreme Court held in Youngstown , the President cannot aggrandize his office and absorb powers that the Constitution has vested in Congress simply by applying a foreign-relations gloss. See 343 U.S. at 586-88, 72 S.Ct. 863 (holding that resolution of labor disputes "is a job for the Nation's lawmakers" notwithstanding impact on war). While the Proclamation undoubtedly has some foreign affairs consequences, significant costs also redound on ordinary Americans and their families. The power to dramatically reorganize domestic affairs in this way, particularly in the absence of war or national emergency, resides with Congress. Indeed, Congress's power cannot be said to be plenary if the President could, at any time, create and enforce his own priorities. Were the President to wield unilateral and inherent authority on questions that the judiciary is ill-suited to second-guess, he would wield the sole power to create, interpret, and implement the law as he sees fit. Even Congress may not be able to constrain that inherent Article II power-a result that undermines centuries of established precedent. This cannot be.
I therefore decline to decide whether the President could enact the Proclamation without statutory authorization because that claim is not squarely raised on the Proclamation's face. Instead, I construe the Proclamation's invocation of the INA to mean that the President thought legislative authority was necessary to enact the ban. Because the Proclamation exceeded *308 the delegated powers on which it relies, I conclude that Plaintiffs are likely to succeed in showing that the Proclamation, in large part, is unlawful.
IV.
For all of these reasons, I conclude that Plaintiffs have shown a likelihood of success in their statutory claims. In enacting the Proclamation, the President has exceeded the scope of his authority under § 1182(f) and § 1185(a)(1) and violated § 1152(a). Because the President lacks authority under the INA to issue a nationality-based restriction absent exigency, I conclude that the Proclamation should be enjoined as to § 2(a)-(e) and (g)-(h).[30] But the injunction should not extend to § 2(f) (Venezuela) because the travel restrictions on the Venezuelan government officials are lawful under the INA. On these grounds, I would affirm in part and vacate in part the district court's entry of a preliminary injunction.
BARBARA MILANO KEENAN, Circuit Judge, with whom Judge Wynn joins as to Part I, Judge Diaz joins as to Part I and Part II.A.2, and Judge Thacker joins in full, concurring:
I concur in the majority opinion's analysis of the plaintiffs' constitutional claim and the majority opinion's holding that the Proclamation likely violates the Establishment Clause. I write separately because, in my view, 8 U.S.C. § 1182(f) is a carefully delineated statute that does not permit the broad reach of the Proclamation, and the Proclamation conflicts with the anti-discrimination provision of 8 U.S.C § 1152(a). On these additional bases, I would hold that the plaintiffs are entitled to injunctive relief.
I.
A.
I begin by addressing the justiciability issues surrounding the plaintiffs' statutory claims.[1] Article III of the Constitution limits the judicial power of the federal courts to the consideration of actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To invoke this power, a plaintiff must have standing. Hollingsworth v. Perry , 570 U.S. 693, 133 S.Ct. 2652, 2661, 186 L.Ed.2d 768 (2013). To establish standing to bring suit, a plaintiff must show that he has suffered an injury in fact that is "actual or imminent" and "concrete and particularized," (2) the injury is fairly traceable to the defendants' actions, and (3) it is "likely," and not "merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defs. of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). Prolonged separation from one's family members constitutes a cognizable injury-in-fact. See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State , 45 F.3d 469, 471 (D.C. Cir. 1995), vacated on other grounds , 519 U.S. 1, 117 S.Ct. 378, 136 L.Ed.2d 1 (1996) (per curiam). By barring entry of nationals from the Designated Countries, the Proclamation operates to delay or possibly permanently prevent the issuance of visas to nationals from those countries.
*309 IRAP Plaintiff John Doe #4 is an American citizen who filed a visa application for his Iranian national wife. His wife completed her interview, but her request for a visa is still pending. The terms of the Proclamation will at a minimum delay, if not permanently bar, John Doe #4's wife from gaining entry into the United States. The likelihood of this occurring is neither speculative nor remote. Accordingly, I conclude that IRAP Plaintiff John Doe #4 has established the existence of an injury-in-fact that is fairly traceable to the Proclamation and is likely to be redressed by a favorable decision in this case. See Bostic v. Schaefer , 760 F.3d 352, 370-71 (4th Cir. 2014) (holding that only one plaintiff need have standing for the Court to consider a particular claim); Bowsher v. Synar , 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (determining that the presence of one party with standing was sufficient to confer Article III standing).
B.
I also conclude that the doctrine known as "consular nonreviewability" does not preclude our consideration of the Proclamation. Under this doctrine, "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." U.S. ex rel. Knauff v.Shaughnessy , 338 U.S. 537, 543, 70 S.Ct. 309, 94 L.Ed. 317 (1950) ; Saavedra Bruno v. Albright , 197 F.3d 1153, 1159 (D.C. Cir. 1999) (explaining that "a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise").
Here, however, the plaintiffs do not challenge individual visa decisions made by consular officers. Instead, the plaintiffs are challenging whether the President's action issuing the Proclamation falls within the authority Congress delegated to the President in the INA. This issue whether the President has acted lawfully pursuant to delegated statutory authority presents a question of statutory construction. Certainly, the Executive has broad discretion over the exclusion of aliens, but it is our "duty ... to say where t[he] statutory and constitutional boundaries" to the Executive's discretion lie. Abourezk v. Reagan , 785 F.2d 1043, 1061 (D.C. Cir. 1986), aff'd by an equally divided court , 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).
In addition, neither Knauff nor Saavedra Bruno precludes this Court from reviewing the Proclamation. Those decisions relate only to particular individual aliens being denied entry into the United States. Knauff , 338 U.S. at 539-40, 70 S.Ct. 309 ; Saavedra Bruno , 197 F.3d at 1155-56, 1162-64. Indeed, the Supreme Court in Sale v. Haitian Centers Council, Inc. , 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993), considered whether the President had exceeded the bounds of his authority under Section 1182(f) when he "suspended the entry of undocumented aliens from the high seas." Sale , 509 U.S. at 159-60, 187-88, 113 S.Ct. 2549. In addressing the merits of that challenge addressing the President's exercise of his authority under Section 1182(f), the Supreme Court necessarily decided the issue of its subject matter jurisdiction in the affirmative. See id. at 187-88, 113 S.Ct. 2549. This case likewise presents a question regarding the lawfulness of executive action under Section 1182(f) that, in accordance with the decision in Sale , we may review here.
C.
I also conclude that the plaintiffs have a cause of action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 - 706, to challenge final agency action implementing the Proclamation. Alternatively, I *310 conclude that the Court has inherent authority to review the plaintiffs' statutory claims.
The APA provides judicial review to a party who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. This general grant of review only extends to "final agency action," id. § 704, and is not available if "agency action is committed to agency discretion by law," id. § 701(a)(2).
Although the APA does not provide for judicial review of the President's own actions, see Franklin v. Massachusetts , 505 U.S. 788, 800-01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), the legality of those actions are reviewable in a suit that "seek[s] to enjoin the officers who attempt to enforce the President's directive," id. at 828, 112 S.Ct. 2767 (Scalia, J., concurring). The plaintiffs have done precisely that by suing a number of agencies and agency heads, such as the Department of Homeland Security, which are responsible for implementation of the Proclamation.
The Proclamation already is being enforced by these federal agencies, which enforcement carries direct consequences for the plaintiffs and similarly situated individuals. Thus, these agency actions are "final" and are reviewable under the APA. Bennett v. Spear , 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citation omitted); 5 U.S.C. § 704.
In addition, I am not persuaded that the APA precludes review of the Proclamation on the ground that the Proclamation is an action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is narrow and applies only when "statutes are drawn in such broad terms that ... there is no law to apply." Heckler v. Chaney , 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (citation omitted). In contrast, here, the President's statutory authority is limited by discernible textual and structural statutory limits, and we are asked to review whether the Proclamation has exceeded those limits, a task previously undertaken by the Supreme Court and other federal courts of appeal. See Sale , 509 U.S. at 187-88, 113 S.Ct. 2549 ; cf. Abourezk , 785 F.2d at 1051 (concluding that the INA "does not commit to unguided agency discretion the decision to exclude an alien").
The plaintiffs are "adversely affected or aggrieved by agency action within the meaning of a relevant statute," namely, the INA. 5 U.S.C. § 702. For claims that involve a statutory cause of action, a plaintiff must have interests that "fall within the zone of interests protected by the law invoked." Lexmark Int'l, Inc. v. Static Control Components, Inc. , --- U.S. ----, 134 S.Ct. 1377, 1388, 188 L.Ed.2d 392 (2014) (citation omitted).
The interests asserted in the plaintiffs' challenge to the Proclamation fall within the zone of interests protected by the INA. The plaintiffs assert that they will be separated from family members if the Proclamation is permitted to take effect. When Congress enacted the INA, it "implemented the underlying intention of our immigration laws regarding the preservation of the family unit." Legal Assistance for Vietnamese Asylum Seekers , 45 F.3d at 472 (citation and brackets omitted). Indeed, the "INA authorizes the immigration of family members of United States citizens and permanent resident aliens." Id. at 471-72. Given the purpose and function of the INA, the individual plaintiffs' interests easily fall within the INA's protected zone of interests.
And, more generally, I conclude that the judiciary also has inherent authority to review presidential actions that are challenged by those affected as having exceeded *311 the scope of the statutory authority given to the President. See Hawaii v. Trump , 878 F.3d 662, 682-83 (9th Cir. 2017) (discussing courts' ability to "review ultra vires actions by the President that go beyond the scope of the President's statutory authority"). Indeed, courts regularly have reviewed executive action, including in the context of immigration, to determine whether a particular executive action exceeded constitutional or statutory authority. See, e.g. , Sale , 509 U.S. at 187-88, 113 S.Ct. 2549 (reviewing on the merits a challenge to an executive order issued pursuant to Section 1182(f) of the INA without reference to the APA); Armstrong v. Exceptional Child Ctr., Inc. , --- U.S. ----, 135 S.Ct. 1378, 1384, 191 L.Ed.2d 471 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."); Chamber of Commerce v. Reich , 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (permitting judicial review of a Presidential action through a challenge brought against the Secretary of Labor tasked with enforcing the President's order).
The plaintiffs ask us to do what the judiciary routinely has done since the Republic's founding, namely, to determine whether a particular presidential action has surpassed the boundaries placed on presidential authority by Congress and by the Constitution. I therefore find that the plaintiffs' statutory claims are justiciable and proceed to consider the merits of those claims.
II.
We review a district court's decision to grant a preliminary injunction under an abuse-of-discretion standard. Aggarao v. MOL Ship Mgmt. Co. , 675 F.3d 355, 366 (4th Cir. 2012). Under this standard, we examine the district court's factual findings for clear error and consider its legal conclusions de novo. Dewhurst v. Century Aluminum Co. , 649 F.3d 287, 290 (4th Cir. 2011).
A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that [a] plaintiff is entitled to such relief." Real Truth About Obama, Inc. v. FEC , 575 F.3d 342, 346 (4th Cir. 2009) (quoting Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) ), vacated on other grounds , 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). Preliminary relief affords a party before trial the type of relief ordinarily available only after trial. Id. at 345. A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave , 553 F.3d 292, 298 (4th Cir. 2009) (citing Winter , 555 U.S. at 20, 129 S.Ct. 365 ).
A.
I first address whether the plaintiffs are entitled to preliminary relief based on the likelihood that the Proclamation does not comport with the INA, namely, that the Proclamation fails to comply with certain threshold requirements under Section 1182(f), and whether the Proclamation conflicts with other provisions of the INA.
1.
Under Article I of the Constitution, the power to make immigration laws "is entrusted exclusively to Congress." Galvan v. Press , 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) ; see *312 U.S. Const. art. 1, § 8, cl. 1, 4 ("The Congress shall have Power ... [t]o establish an uniform Rule of Naturalization...."); Fiallo v. Bell , 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." (citation and internal quotation marks omitted) ). Congress has implemented its immigration power principally through an "extensive and complex" statutory code that "specifie[s]" in considerable detail the "categories of aliens who may not be admitted to the United States." See Arizona v. United States , 567 U.S. 387, 395, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012).
In the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163, 188, Congress delegated a limited aspect of its immigration authority to the President in a provision of the INA that is now § 212(f), codified at 8 U.S.C. § 1182(f). That section provides:
Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.
8 U.S.C. § 1182(f). This section is cited in the Proclamation as the chief legal basis for the President's action to bar indefinitely the entry of most nationals from seven of the eight Designated Countries.[2] 82 Fed. Reg. at 45,161-45,162.
The plaintiffs claim that the Proclamation is unlawful because it exceeds the scope of Congress' grant of authority to the President under Section 1182(f). This claim raises initial questions regarding (1) whether the statute permits a wide-sweeping ban of unlimited duration and (2) whether the Proclamation bans entry based on permissible "classes of aliens."
In interpreting a statute, courts first must determine whether the meaning of the statute is ascertainable through the text alone. See United States v. Ide , 624 F.3d 666, 668 (4th Cir. 2010). A statute's plain meaning derives from consideration of all the words employed, rather than from reliance on isolated statutory phrases. Id. (citing United States v. Mitchell , 518 F.3d 230, 233-34 (4th Cir. 2008) ). Courts "strive to give effect to every word that Congress has used" to avoid surplusage in the construction of any statute. Clinchfield Coal Co. v. Harris , 149 F.3d 307, 313 (4th Cir. 1998). This concept reflects our unwillingness to interpret a statutory provision in such a manner that it renders superfluous other provisions in the same statutory scheme. United States v. Jicarilla Apache Nation , 564 U.S. 162, 185, 131 S.Ct. 2313, 180 L.Ed.2d 187 (2011) (citing *313 Mackey v. Lanier Collection Agency & Serv., Inc. , 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) ); see also Hedin v. Thompson , 355 F.3d 746, 750 (4th Cir. 2004). Fundamentally, we interpret statutes to "ensure that the statutory scheme is coherent and consistent." Ali v. Fed. Bureau of Prisons , 552 U.S. 214, 222, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008).
a.
Although the language of Section 1182(f) provides broad discretion to the President to suspend the entry of aliens or classes of aliens, that discretion is not limitless. See United States v. Witkovich , 353 U.S. 194, 199, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957) (explaining that broadly worded immigration statutes should not be read "in isolation and literally" to confer "unbounded authority"). Section 1182(f) permits the President to "suspend" the entry of all aliens or any class of aliens "for such period" as the President deems necessary. Under a plain reading of this language, Section 1182(f) does not authorize the President to implement a ban allowing the exclusion of millions of aliens on a permanent basis.
Because the INA does not define the term "suspend," we accord the term its ordinary or "common usage." See United States v. Murphy , 35 F.3d 143, 145 (4th Cir. 1994) (citation omitted). "The word 'suspend' connotes a temporary deferral." Hoffman ex rel. N.L.R.B. v. Beer Drivers & Salesmen's Local Union No. 888 , 536 F.2d 1268, 1277 (9th Cir. 1976) (citing Webster's Third New International Dictionary (1966) and Bouvier's Law Dictionary (3d ed. 1914) ); see also Martinez v. Plumbers & Pipefitters Nat'l Pension Plan , 795 F.3d 1211, 1221-22 (10th Cir. 2015) (interpreting the term "suspend" in conjunction with the word "resume" as referring to a temporary withholding of benefits); United Air Lines, Inc. v. Civil Aeronautics Bd. , 198 F.2d 100, 108 (7th Cir. 1952) ("We agree that the power of the Board to 'suspend' does not include the power to 'revoke.' "); Black's Law Dictionary 1690 (3d ed. 1944) (defining "suspend" as "[t]o interrupt; to cause to cease for a time; to stay, delay, or hinder; to discontinue temporarily, but with an expectation or purpose of resumption").[3]
Moreover, Section 1182(f) refers to the President's authority to issue restrictions on the entry of aliens for a singular "period" of time. The word "period" implies "a stated interval of time commonly thought of in terms of years, months, and days." United States v. Updike , 281 U.S. 489, 495, 50 S.Ct. 367, 74 L.Ed. 984 (1930).
The Proclamation, however, does not contain language reflecting any temporal limitation. As drafted, the Proclamation permits the President to ban entry of these millions of aliens on a permanent basis. Nevertheless, the government urges us to place the most benign construction on the President's present exercise of authority, and effectively asks us to assume that the President will amend the ban when his concerns are addressed by the identified countries. Yet that is not the task before us. We do not look at the narrowest possible view of what action the President may choose to take under the Proclamation, or assume that he will not exercise all the power he has claimed in that document. Instead, we must answer *314 the question whether the statute permits the President to exercise fully the power he has asserted within the four corners of the Proclamation.
The absence of any temporal limitation in the Proclamation directly departs from the framework of EO-2, which was written so that the nationality ban would take effect for only a limited period of 90 days. Exec. Order No. 13,780, 82 Fed. Reg. 13,209, 13,213 (Mar. 6, 2017). In fact, in defending EO-2, the government vigorously argued that the "temporary pause" contained in EO-2 provided justification for the broad ban of more than 180 million foreign nationals. See Brief for Appellant at 2, 9, Int'l Refugee Assistance Project v. Trump , 857 F.3d 554 (4th Cir. 2017) (en banc) (No. 17-1351), vacated as moot , --- U.S. ----, 138 S.Ct. 353, 199 L.Ed.2d 203 (2017).
Section 4(a) of the Proclamation contemplates periodic reviews by various high-level cabinet officers every 180 days to allow those officers to advise the President whether any of the restrictions imposed by Section 2 "should be continued, modified, terminated, or supplemented." 82 Fed. Reg. at 45,169. However, this periodic review process does not transform the indefinite ban of more than 150 million nationals into merely a temporary interruption of the INA's carefully crafted statutory scheme. Rather, the language of the Proclamation permits the ban on entry of the designated nationals to remain permanently in force, effectively rewriting the INA in material respects. Accordingly, I conclude that the Proclamation is inconsistent with the plain language of Section 1182(f), in which Congress granted the President authority to "suspend" entry of aliens for a "period" of time.
b.
Separately, I consider the authority of the President under Section 1182(f) to suspend the entry of "any class of aliens." 8 U.S.C. § 1182(f). On a superficial level, the group of more than 150 million foreign nationals may be said to qualify as a "class of aliens," based on the definition of "class" as "[a] group of people, things, qualities, or activities that have common characteristics or attributes." See Black's Law Dictionary 304 (10th ed. 2014). However, we must consider the term further in the context of the full statutory provision and of the INA as a whole.
Section 1182(f) appears within a statutory section that contains a robust, detailed list of "[c]lasses of aliens" which Congress deemed ineligible for admission to the United States. See 8 U.S.C. § 1182(a). These categories range from the specific to the general, including classes of individuals who pose a variety of health, safety, and security risks, or are likely to become public charges. See id . Notably, each of these classes of inadmissible aliens targets individuals who themselves have engaged in a specified activity, or who have a limitation or condition that renders their admission harmful to the interests of the United States. See, e.g. , 8 U.S.C. § 1182(a)(1)(A) (communicable diseases); id. § 1182(a)(3)(B) (terrorist activities); id. § 1182(a)(4)(A) (public charges). These classes of aliens thus reflect Congress' general intent to structure permanent classes of inadmissible aliens on the basis of the class members' individual circumstances or actions, in contrast to immutable factors such as race or national origin.
When considered in this broader context of other provisions of Section 1182, paragraph (f) authorizes the President to exclude any additional "class of aliens" whose entry would be detrimental to the interests of the United States. The Proclamation, however, restricts affiliated nationals grouped in classes of countries, depending *315 on each country's conditions relating to the criteria of identity-management, information-sharing, and terrorist activity. 82 Fed. Reg. at 45,165-45,167. By focusing on country conditions, the Proclamation, on an indefinite basis, substitutes its own classification system in place of Congress' considered judgment as reflected in the INA's carefully delineated statutory framework.[4] Thus, if we were to adopt the government's construction of Section 1182(f), the President effectively could rewrite the INA's "extensive and complex" restrictions on alien admissibility, Arizona , 567 U.S. at 395, 132 S.Ct. 2492, substituting national origin on a permanent basis for the limits designed by Congress and thereby transforming many provisions of the INA into mere suggestions.
My analysis might be different had Congress manifested a clear intent in Section 1182(f) to give the President the authority to override other provisions in the INA. Certain other provisions in the INA, as well as other bodies of statutory law, contain language of that nature demonstrating an expansive legislative intent. See, e.g. , 8 U.S.C. § 1182f ("Notwithstanding any other provision of law and except as provided in subsection (b)" (emphasis added) ); 11 U.S.C. § 1123 ("Notwithstanding any otherwise applicable nonbankruptcy law" (emphasis added) ); United States v. McLymont , 45 F.3d 400, 401 (11th Cir. 1995) (per curiam) (interpreting 18 U.S.C. § 924(c) and holding that "Congress' use of the phrase 'notwithstanding any other provision of law' makes it clear that Congress intended the penalty provisions of § 924(c) to take precedence over any preexisting or subsequently-enacted sentencing legislation, including the Sentencing Guidelines"). The absence of similar language in Section 1182(f) indicates that Congress did not intend for the President to have authority to issue an alien ban that permits him to implement a permanent amendment of the INA's carefully crafted statutory scheme.
c.
My conclusion that the President exceeded the scope of his authority under Section 1182(f) is not altered by the government's reliance on the only two prior orders issued by presidents barring entry of individuals based on national origin. The first was issued by President Jimmy Carter, and the second was issued by President Ronald Reagan. Of primary importance, neither of these orders was challenged as exceeding the scope of the President's authority under Section 1182(f). Further, both orders are readily distinguishable from the present Proclamation.
President Carter's order, issued in 1979, authorized executive branch officials to prescribe limits on rules governing the entry of Iranian nationals holding nonimmigrant visas during the Iran Hostage Crisis. Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979). This order neither issued an unlimited ban on the entry of Iranian nationals, nor was it issued pursuant to Section 1182(f). See id.
In 1986, President Reagan restricted Cuban nationals from entering the United States as immigrants in response to a discrete diplomatic crisis in which Cuba had breached an immigration agreement after lesser sanctions had failed. Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 22, 1986) ; 86 U.S. Dep't of State Bull. No. 2116, Cuba: New Migration and Embargo *316 Measures 86-87 (Nov. 1986). Although this order identified aliens by nationality and did not contain an expiration date, the order made clear that the terms would expire when the Attorney General and the Secretary of State determined that normal migration procedures with Cuba were restored. This language, unlike the language of the Proclamation, manifested a temporary duration for the ban.
These two prior orders also were far narrower in their terms than the unlimited interpretation of Section 1182(f) the government offers to support the Proclamation. Moreover, not one of the prior 43 proclamations issued under Section 1182(f) banned entry by nationals of more than one country at the same time based on their nationality. See Kate M. Manuel, Cong. Research Serv., R 44743, Executive Authority to Exclude Aliens: In Brief 6-10 (2017). And, 42 of these 43 orders issued prior to the present Proclamation excluded aliens who themselves engaged in or were involved in conduct harmful to the national security or some other interest of the United States.[5] Id .
Ultimately, however, whatever scope these past executive actions may have had is not dispositive of the issue before us. Under any articulation of limits contemplated by Congress in enacting Section 1182(f), this Proclamation exceeds the President's authority under the INA by effectively rewriting for an unlimited duration the INA's criteria for admissibility of aliens.
2.
I also conclude that the President failed to make the necessary findings to support his invocation of authority under Section 1182(f). Section 1182(f) requires that the President "find[ ]" that entry of the aliens in question "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f) (emphasis added).[6] Importantly, Congress deliberately used the word "find[ ]" as opposed to "deem" or "believe," a decision that implies that the President is required to "base his [decision] on some fact" not on mere "opinion" or "guesses." Hawaii , 878 F.3d at 692-93 (citing 87 Cong. Rec. 5051 (1941) (statements of Rep. Jonkman and Rep. Jenkins)). Accordingly, an executive "finding" that supports the exercise of authority under Section 1182(f) must not be merely conclusory in nature, void of any substantive content.
The principal reason cited in the Proclamation for banning nearly every national of seven of the eight countries is that those countries lack adequate "identity-management and information-sharing protocols and practices" to provide the United States "sufficient information to assess the risks" that their nationals pose. 82 Fed. Reg. at 45,164. The Proclamation also states a diplomatic purpose to encourage foreign governments to improve their information-sharing practices, and other *317 general "foreign policy, national security, and counterterrorism objectives." Id.
The Proclamation, however, makes no finding that any nationals from the specified countries, by virtue of their nationality , pose a risk to the United States. The Proclamation merely exclaims that the countries ' faulty protocols create a security risk for the United States. Nowhere in the Proclamation does the President claim that these individuals pose a detriment to the United States' interests because they are nationals of these particular countries. Further, with the exception of Venezuela, see 82 Fed. Reg. at 45,166, the Proclamation lacks any finding that these nationals are responsible for the unstable conditions in their respective countries. Essentially, the Proclamation suffers from the same deficiency as its predecessor: the Proclamation fails to find that the entry of these particular nationals would be detrimental to the interests of the United States.
Nevertheless, the government seeks to justify the ban on the ground that it will serve as a bargaining chip to help elicit greater cooperation from the Designated Countries. This rationale, however, likewise fails to provide an analytical link to the banned nationals. The ability of the Proclamation to wield diplomatic pressure on the target countries is unrelated to the nationals' entry into the United States. That the Proclamation may further diplomatic goals has no association with whether the designated nationals' entry would be detrimental or injurious to the United States in some way. If any such connection between the stated diplomatic purpose and the identified nationals' entry does exist, it is nowhere to be found within the Proclamation's text. Accordingly, I conclude that the plaintiffs are likely to succeed on their claim that the Proclamation fails to make a finding of detriment to the national interest sufficient to invoke Section 1182(f).
3.
Finally, I consider the effect of the INA's anti-discrimination provision, 8 U.S.C. § 1152(a), on the President's authority to issue the Proclamation. Section 1152(a) provides, in relevant part:
[N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality , place of birth, or place of residence.
8 U.S.C. § 1152(a)(1)(A) (emphasis added). This provision, enacted in 1965, Pub. L. No. 89-236, 79 Stat. 911, reflects Congress' efforts to move away from nationality and race-based discrimination in immigration policy and move toward "equality and fairplay in our selecting of immigrants." See 110 Cong. Rec. 1057 (1964) (statement of Sen. Hart).
The government attempts to reconcile the President's authority under Section 1182(f) with the INA's anti-discrimination provision by arguing that the Proclamation bars the entry of nationals from the Designated Countries, but does not deny the issuance of immigrant visas to those nationals. However, basic principles of statutory interpretation, as well practical realities attending the Proclamation, lead me to reject this argument.
"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Food & Drug Admin. v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citation and internal quotation marks omitted). When possible, we must interpret a statute so that all of its component parts work as "a[ ] harmonious whole." Id. (citation omitted). Applying this principle to the INA, I conclude that *318 the INA itself recognizes the substantial overlap between denial of entry and the issuance of a visa.
8 U.S.C. § 1201(g) provides that "No visa ... shall be issued to an alien ... ineligible to receive a visa ... under section 1182...." The Proclamation's own text affirms that the concepts of visa issuance and entry are intertwined. Section 3(a) of the Proclamation states that, on its effective date, the Proclamation is applicable to those outside the United States who "do not have a valid visa " and "do not qualify for a visa ." 82 Fed. Reg. at 45,167 (emphasis added). Thus, when the President suspends the entry of certain designated nationals, rendering those nationals inadmissible under Section 1182(f), the nationals must be denied visas under Section 1201(g). See generally 8 U.S.C. § 1182. Accordingly, in circular fashion, the Proclamation's ban on entry functions as a ban on the issuance of visas on the basis of nationality, because an immigrant cannot seek entry into the United States without first obtaining an immigrant visa.
The government's contrary argument would require us to conclude that under Section 1182(f), the President could indefinitely nullify the protections against discrimination enshrined in Section 1152(a)(1)(A). Yet the INA lacks any language suggesting that Congress intended such a result.
To the contrary, Section 1152(a)(1)(A) specifically identifies three exemptions from its non-discrimination mandate: Sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153. Section 1182(f) is not included. We presume that Congress' inclusion of some items and its exclusion of other items is intentional. See TRW Inc. v. Andrews , 534 U.S. 19, 28-29, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).
To the extent that Section 1152(a)(1)(A) conflicts with Section 1182(f), Section 1152(a)(1)(A) governs. When we are confronted with seemingly conflicting statutory provisions, the later-enacted and more specific provision is treated as an exception to the earlier-enacted, more general provision. See RadLAX Gateway Hotel, LLC v. Amalgamated Bank , 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012) ("The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one."); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 183-87 (2012). Section 1152(a)(1)(A) was enacted in 1965, more than a decade after Section 1182(f) was enacted. And Section 1152(a)(1)(A) operates as a more specific bar on nationality-based discrimination in the issuance of visas, while Section 1182(f) articulates the general boundaries of the President's authority to suspend the entry of aliens.
For these reasons, I conclude that the Proclamation's indefinite suspension of entry constitutes discrimination in the issuance of immigrant visas. Accordingly, the plaintiffs have shown a likelihood of success on the merits of this statutory argument, because the Proclamation violates Section 1152(a)(1)(A) 's prohibition on nationality-based discrimination.
4.
We will adopt a reasonable construction of a statute in order to save the statute from being constitutionally infirm. See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council , 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) ; see also *319 INS v. St. Cyr , 533 U.S. 289, 300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("[W]e are obligated to construe the statute to avoid [serious constitutional] problems."). The government has urged this Court to adopt a reading of Section 1182(f) that permits the President's far-reaching exercise of authority in the Proclamation. Were we to do so, the statute would lack an "intelligible principle" delineating the "general policy" to be applied and "the boundaries of th[e] delegated authority." Hawaii , 878 F.3d at 690 (quoting Mistretta v. United States , 488 U.S. 361, 372-73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ). Absent a meaningful constraint on the Executive's delegated authority in Section 1182(f), Congress will have effected an invalid delegation of its "exclusive[ ]" authority to legislate regarding the entry of aliens. Id. (quoting Galvan , 347 U.S. at 531, 74 S.Ct. 737 ). Accordingly, I decline to accept the government's position, because such an interpretation of Section 1182(f) raises serious constitutional problems that we must avoid.
The Constitution does not authorize "unilateral Presidential action that either repeals or amends parts of duly enacted statutes." Hawaii , 878 F.3d at 690-91 (citing Clinton v. City of N.Y. , 524 U.S. 417, 439, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ). Nor does the Constitution permit such action even when the Executive is responding to issues that would place our "Constitution and its survival in peril." See Clinton , 524 U.S. at 449, 118 S.Ct. 2091 (Kennedy, J., concurring). Simply put, the political branches do not "have a somewhat free hand to reallocate their own authority," even when faced with issues of "first importance," because our Constitution "requires a stability which transcends the convenience of the moment" and was crafted accepting that "[c]oncentration of power in the hands of a single branch is a threat to liberty." Hawaii , 878 F.3d at 691 (citing Clinton , 524 U.S. at 449-50, 118 S.Ct. 2091 ).
The government's reading of Section 1182(f) directly implicates these separation of powers concerns. The Proclamation allows a permanent restriction on immigration that functions as an executive override of the immigration scheme that Congress chose to enact. If this exercise of authority were permissible under Section 1182(f), then Congress necessarily enabled the President to upend its considered legislative judgment and, thus, to disrupt the balance of our separation of powers. These separation of powers principles are especially important in the present case, because the President effectively has legislated immigration policy, an area reserved to congressional policymaking. See Galvan , 347 U.S. at 531, 74 S.Ct. 737.
Though Congress chose to delegate limited authority in this area to the President, the INA sets out the conditions for the exercise of such executive power. When a statute delineates the boundaries of the authority delegated by Congress to the executive branch of government, this process reflects "the result of a deliberative and reflective process engaging both of the political branches." Hamdan v. Rumsfeld , 548 U.S. 557, 637, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (Kennedy, J., concurring in part), superseded by statute on other grounds , Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600. The President may not thereafter exercise his delegated authority in a manner incompatible with the result of this deliberative process.
The President, through the issuance of the Proclamation, has acted in such a manner. Consequently, he has placed his power "at its lowest ebb."[7]
*320 Youngstown Sheet & Tube Co. v. Sawyer , 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). In this zone, "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." Id. at 638, 72 S.Ct. 863.
The Proclamation is inconsistent not only with the text of Section 1182(f). It is inconsistent not only with the statutory framework of the INA. And it is inconsistent not only with the anti-discrimination provision of Section 1152(a)(1)(A). Rather, the Proclamation is inconsistent with all three. It may be that no single one of these problems renders the Proclamation unlawful. However, these several conflicts between the Proclamation and the INA requires us to acknowledge that the President has overstepped the authority Congress granted him in Section 1182(f). Having scrutinized the Proclamation with the caution that is required, I conclude that the Proclamation exceeds the grant of authority in Section 1182(f) and, thus, that the plaintiffs are likely to succeed on the merits of their statutory claims.
B.
Because the plaintiffs have established a likelihood of success on the merits of their statutory claims, I turn to consider the second Winter factor, namely, whether the plaintiffs have shown a likelihood of irreparable harm. 555 U.S. at 20, 129 S.Ct. 365. The Proclamation would result in the prolonged, if not indefinite, separation of the plaintiffs and their family members. Those harms are quintessential examples of irreparable harms, because they cannot be adequately remedied through monetary damages. See Hernandez v. Sessions , 872 F.3d 976, 995 (9th Cir. 2017) (characterizing the "collateral harms to children of detainees whose parents are detained" as an irreparable harm); see also Andreiu v. Ashcroft , 253 F.3d 477, 484 (9th Cir. 2001) (en banc) (recognizing "separation from family members" as an "important factor[ ]" in the balance of hardships); cf. Moore v. City of E. Cleveland , 431 U.S. 494, 503-04, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (explaining that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition"). I therefore conclude that the plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief.
C.
Next, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief."
*321 Winter , 555 U.S. at 24, 129 S.Ct. 365 (citation omitted). The government argues that the injunction causes direct, irreparable injury by constraining the Executive's authority in enforcing laws related to national security.
Certainly, "the Government's interest in combating terrorism is an urgent objective of the highest order." Holder v. Humanitarian Law Project , 561 U.S. 1, 28, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010). However, the President must abide by the requirements of Section 1182(f) and exercise his authority within the limits imposed by other provisions of the INA. Here, the President has not done so. Because the President has exceeded the scope of his statutory authority under Section 1182(f), has nullified the protections of Section 1152(a)(1)(A), and has failed to make the required finding that the "entry" into the United States of certain classes of aliens "would be detrimental to the interests of the United States," 8 U.S.C. § 1182(f), I cannot conclude that national security interests outweigh the harms to the plaintiffs.[8]
D.
Finally, a court must determine whether preliminary injunctive relief is in the public interest. Manifestly, national security is a vital public interest. See Haig v. Agee , 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) ("[N]o governmental interest is more compelling than the security of the Nation."). However, the public's interests are served by ensuring that any actions taken by the President under Section 1182(f) do not usurp the constraints on his authority as set forth in the INA. And, fundamentally, the public and our system of governance are served by "protecting separation of powers" through the "curtail[ment of] unlawful executive action." Texas v. United States , 809 F.3d 134, 187 (5th Cir. 2015). Accordingly, I conclude that the public interest favors affirming the district court's judgment granting a preliminary injunction. See Winter , 555 U.S. at 24, 129 S.Ct. 365 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citation omitted) ).
III.
Accordingly, in addition to affirming the district court's judgment with respect to the plaintiffs' Establishment Clause claim and the issuance of a nationwide injunction, I would affirm the court's judgment and award of injunctive relief on the basis that the Proclamation likely violates the INA's prohibition on discrimination in the issuance of immigrant visas under Section 1152(a)(1)(A). I would vacate the portion of the district court's judgment holding that the President likely did not exceed his authority under Section 1182(f) in issuing the Proclamation.

During the pendency of the litigation, the relatives of IAAB Plaintiff Doe No. 6, Zakzok Plaintiff Sumaya Hamadmad, and IRAP Plaintiffs Grannaz Amirjamshidi, Shapour Shirani, and Fakhri Ziaolhagh received their visas. Notice 1, Dec. 6, 2017, ECF No. 160. Zakzok Plaintiff Hamadmad still has another family member who has not yet received a visa. Id. In addition, the mother-in-law of IAAB Plaintiff Doe No. 6 was denied a visa and a waiver pursuant to the Proclamation. Mot. Suppl. R. Ex. A, Dec. 22, 2017, ECF No. 162.

Plaintiffs also sought a preliminary injunction based on their Equal Protection claim. IRAP v. Trump , 265 F.Supp.3d at 594-95. Because the district court did not reach the question, id. at 629, and because we are able to resolve the case without it, we need not address whether the Proclamation violates the Equal Protection Clause.

We take judicial notice of these agency statements in the public record. See Goldfarb v. Mayor & City Council of Baltimore , 791 F.3d 500, 508 (4th Cir. 2015) ; Hall v. Virginia , 385 F.3d 421, 424 & n.3 (4th Cir. 2004) (taking judicial notice of publicly available information on state government's website).

Chief Judge Gregory and Judges Motz, King, Keenan, Wynn, Diaz, Floyd, Thacker, and Harris, a majority of the Court, find that Plaintiffs have shown a likelihood of success on their Establishment Clause claim. Chief Judge Gregory and Judges Keenan, Wynn, Diaz, and Thacker also find that Plaintiffs are likely to succeed on at least some of their statutory claims. Judges Motz, King, and Harris would resolve the case only on Establishment Clause grounds without reaching the statutory questions.

The Government concedes that this Court has jurisdiction to review an alleged violation of constitutional rights. First Cross-Appeal Br. 25; see Bell v. Hood , 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (noting that "it is established practice" for the Supreme Court "to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"). The Government also concedes that the doctrine of consular nonreviewability does not bar judicial review of Plaintiffs' constitutional claim. See First Cross-Appeal Br. 25-26 (citing Kleindienst v. Mandel , 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), and Kerry v. Din , --- U.S. ----, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015) ); see also Fiallo v. Bell , 430 U.S. 787, 793 n.5, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) ("Our cases reflect acceptance of a limited judicial responsibility under the Constitution even with respect to the power of Congress to regulate the admission and exclusion of aliens[.]"). Finally, the Government does not argue that Plaintiffs lack a cause of action to sue for injunctive relief under the Constitution. See Bell , 327 U.S. at 684, 66 S.Ct. 773 ; see also Ziglar v. Abbasi , --- U.S. ----, 137 S.Ct. 1843, 1862, 198 L.Ed.2d 290 (2017) (denying post-9/11 detainees damages action but stating that they could seek injunctive relief); Franklin v. Massachusetts , 505 U.S. 788, 801, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (stating that President's actions can always be reviewed for constitutionality).

The Government cites Allen v. Wright for the proposition that "the stigmatizing injury often caused by racial [or other invidious] discrimination ... accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." First Cross-Appeal Br. 27 (quoting 468 U.S. 737, 755, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), abrogated in nonrelevant part by Lexmark Int'l, Inc. v. Static Control Components, Inc. , --- U.S. ----, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014) ). Allen , of course, was an equal protection case; therefore, the stigmatic injury necessarily related to the denial of equal treatment. Because this is an Establishment Clause case, Plaintiffs must allege "a stigmatic injury suffered as a direct result of having" personal contact with unconstitutional religious animus . Allen , 468 U.S. at 755, 104 S.Ct. 3315 ; accord Suhre , 131 F.3d at 1086.

Although one Plaintiff with cognizable injuries suffices to confer Article III standing, Bostic , 760 F.3d at 370-71, we note that other Plaintiffs with family members seeking visas have expressed similar sentiments of fear and marginalization. J.A. 105-09, 581-84 (IRAP Plaintiff Jane Doe No. 2); J.A. 590-93 (IRAP Plaintiff Afsaneh Khazaeli); J.A. 1162-64 (IAAB Plaintiff Doe No. 2); J.A. 1166-68 (IAAB Plaintiff Doe No. 3); J.A. 1170-72 (IAAB Plaintiff Doe No. 5); J.A. 1249-53 (Zakzok Plaintiff Eblal Zakzok); J.A. 1254-58 (Zakzok Plaintiff Sumaya Hamadmad); J.A. 1259-62 (Zakzok Plaintiff John Doe No. 1); J.A. 1263-67 (Zakzok Plaintiff Jane Doe No. 2); J.A. 1268-69 (Zakzok Plaintiff Jane Doe No. 3).

The Government also argues that "a U.S. Christian could challenge the Proclamation's exclusion of his relatives who are Syrian Christians as a violation of his own Establishment Clause rights." Third Cross-Appeal Br. 10 (emphasis omitted). Because there are Plaintiffs who have suffered both stigma and prolonged separation from close family members, which we conclude is sufficient to confer standing, we need not determine whether both stigma and prolonged separation are necessary to confer standing.

"[T]hat an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." Spokeo , 136 S.Ct. at 1548 n.7.

That the travel restrictions were not fully implemented before December 8, 2017, is not critical to our analysis. The agencies had already taken the final steps necessary to implement the restrictions and were only kept from doing so by two nationwide injunctions, one of which we review here. See, e.g. , DHS Fact Sheet, supra ; State Department Statement, supra ("The preliminary injunctions had prohibited the government from fully enforcing or implementing the entry restrictions of Presidential Proclamation 9645 [.]").

As we explained in IRAP I , 857 F.3d at 590 n.15, we join the Ninth Circuit in finding that Justice Kennedy's concurrence in Din is the controlling opinion because it sets forth the narrowest grounds for the Court's judgment. See Cardenas v. United States , 826 F.3d 1164, 1171 (9th Cir. 2016) (citing Marks v. United States , 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ).

Contrary to Judge Niemeyer's assertion, Mandel does not demand that "a lack of good faith ... appear on the face of the government's action." If that were the case, the Court would not have needed to examine the record evidence to determine if the Government's reason for denying Mandel's requested waiver-violation of his prior visas-was true. See 408 U.S. at 756-58, 769, 92 S.Ct. 2576. Nor would it have been necessary in Din to emphasize that the plaintiff "admit[ted] in her Complaint" facts that demonstrated the Government "relied upon a bona fide factual basis for denying" the requested visa. See 135 S.Ct. at 2140-41 (Kennedy, J., concurring in judgment) (emphasis added).

Judge Niemeyer unpersuasively contends that in Mandel and Din , "the plaintiffs alleged bad faith with at least as much particularity as do the plaintiffs here." But in neither case did the plaintiffs' allegations come close to the undisputed facts relied on by Plaintiffs here. In Mandel , the plaintiffs did not dispute that Mandel had violated the conditions of his previous visa, and their allegation of bad faith rested largely on their claim that the Attorney General lacked a sufficient basis to characterize that violation as "flagrant ." See 408 U.S. at 759-60, 92 S.Ct. 2576 (emphasis added). In Din , the plaintiff argued that the State Department denied Din's visa on the basis of "bad faith" or "illegitimate reasons," but did not describe or offer any evidence of what those underlying "bad faith" or "illegitimate reasons" might be. See J.A. at 37, 40, Kerry v. Din , --- U.S. ----, 135 S.Ct. 2128, 192 L.Ed.2d 183, 2015 WL 2473334, at *37, *40. Here, Plaintiffs offered detailed, undisputed evidence of the illegitimate reason motivating the Proclamation, demonstrating that the Proclamation's proffered rationale was offered in bad faith.

The Government argues that this application of the bona fide inquiry "conflicts with ... Sessions v. Morales-Santana , --- U.S. ----, 137 S.Ct. 1678, 1693, 198 L.Ed.2d 150 (2017), which described Mandel 's standard as 'minimal scrutiny (rational-basis review).' " First Br. 41. We see no conflict. Morales-Santana did not even cite Mandel nor involve a First Amendment challenge. The Court used this parenthetical in a very different equal protection case to contrast the "minimal scrutiny" applied in Fiallo v. Bell , 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), to congressionally established gender-based entry preferences with the more rigorous review it applied to gender-based citizenship criteria in Morales-Santana . See 137 S.Ct. at 1693-94.

As a candidate or President-elect, the President "call[ed] for a total and complete shutdown of Muslims entering the United States," J.A. 135; stated that "Islam hates us," J.A. 814-15; called for excluding Muslims because "we're having problems with the Muslims, and we're having problems with Muslims coming into the country," J.A. 311; suggested that he would attempt to circumvent scrutiny of the Muslim ban by formulating it in terms of nationality, rather than religion; and, when asked about his plans "to create a Muslim register or ban Muslim immigration to the United States," replied, "You know my plans all along, and I've proven to be right, 100 percent correct," J.A. 815-20. See IRAP I , 857 F.3d at 594-95.

The Government rather remarkably argues that because there is no suggestion that Cabinet secretaries and other government officials acted in bad faith or harbored anti-Muslim animus when conducting the review, the Proclamation must have a secular purpose. First Br. 43. Our Constitution describes a unitary executive, and "a President, though able to delegate duties to others, cannot delegate ultimate responsibility or the active obligation to supervise that goes with it." Clinton v. Jones , 520 U.S. 681, 713, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (Breyer, J., concurring in the judgment). President Trump alone had the authority to issue the Proclamation; he is responsible for its substance and purpose.

For example, although the Proclamation acknowledges that the review showed that Somalia, a majority-Muslim country, satisfied "the information-sharing requirements of the baseline," Somalian citizens are subject to entry restrictions. 82 Fed. Reg. at 45,167. Similarly, although Immigration and Customs Enforcement has determined that many countries regularly fail to receive deportees from the United States, J.A. 1295, a risk indicator considered in the review, the Proclamation only designates Iranian citizens for entry restrictions for this reason, 82 Fed. Reg. at 45,163, 45,165. Thus, as the district court recognized, the Proclamation's provisions have a greater "disproportionate impact on majority-Muslim countries" than "would otherwise flow from the objective factors considered in the review." IRAP v. Trump , 265 F.Supp.3d at 626.

As fifteen states and the District of Columbia have submitted to the Court, they "all benefit from immigration, tourism, and international travel by students, academics, skilled professionals, and businesspeople." Br. for States of New York, California, Connecticut, Delaware, Illinois, Iowa, Maine, Maryland, Massachusetts, New Mexico, Oregon, Rhode Island, Vermont, Virginia, and Washington, and the District Of Columbia as Amici Curiae at 4. They summarize the effects of the Proclamation as follows:
[T]he Proclamation ... disrupt[s] the ability of our States' public colleges and universities to recruit and retain students and faculty, impairing academic staffing and research needs, and causing the loss of tuition and tax revenues, among other costs. The Proclamation ... disrupt[s] the provision of medical care at amici States' hospitals and further harms our science, technology, finance, and tourism industries by inhibiting ... the free exchange of information, ideas, and talent between the designated countries and our States, causing long-term economic and reputational damage.
Id. The Proclamation's categorical treatment of foreign nationals as potential threats necessarily overlooks their invaluable contributions to our country as individuals and, in doing so, hurts the public interest.

Whether the President has the inherent power to enact the Proclamation is discussed in Part III.

Two Supreme Court cases speak broadly of the President's inherent foreign affairs powers but both involved the delegation of legislative power and therefore cannot stand for the proposition that the President may independently set his own immigration policy. See Knauff , 338 U.S. at 540-42 & n.1, 70 S.Ct. 309 ; United States v. Curtiss-Wright Exp. Corp. , 299 U.S. 304, 319-20, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

Concerns with broad delegations of unconstrained discretion are applicable to the President. See, e.g. , Panama Ref. Co. v. Ryan , 293 U.S. 388, 414-15, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

One might misconstrue some language in Knauff to say that delegating immigration power can never violate nondelegation given the executive's inherent powers. See 338 U.S. at 542-43, 70 S.Ct. 309. However, Knauff upheld a delegation of broad discretion because that discretion was to be exercised only "during a time of national emergency." Id. at 543, 70 S.Ct. 309 ("Congress may in broad terms authorize the executive to exercise the power, e.g., as was done here, for the best interests of the country during a time of national emergency."). Whatever the President's inherent powers during war or national emergency, it does not follow that he has the same powers under ordinary circumstances.

The INA provisions invoked by the Proclamation are similar in critical respects to the statute at issue in Panama , which the Court invalidated on nondelegation grounds. See 293 U.S. at 414-15, 430, 55 S.Ct. 241 (invalidating statute that gave the President discretion to prohibit petroleum in interstate and foreign commerce because decision was "obviously one of legislative policy," and Congress did not provide standards to guide President's exercise of discretion). Congress, in both instances, delegated the power to suspend movement of people or goods in commerce. According to the Government, the INA simply authorizes the President to do whatever he believes best, which means that the only source of guidance derives from the President himself, not Congress. In terms of direction from the legislature, such a "requirement" may as well be nonexistent, as was the case in Panama . See id.

I take judicial notice of these publicly available statistics on the State Department's website. See Goldfarb v. Mayor & City Council of Baltimore , 791 F.3d 500, 508 (4th Cir. 2015).

Whatever the wisdom and constitutionality of the Chinese Exclusion Act today, the power to restrict migration based on nationality, when it has been exercised, has resided with Congress, not the President. See Harisiades v. Shaughnessy , 342 U.S. 580, 597, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (Frankfurter, J., concurring) ("[T]the underlying policies of what classes of aliens shall be allowed to enter ... are for Congress exclusively to determine...."); see also H. R. Res. 683, Expressing the Regret of the House of Representatives for the Passage of Laws that Adversely Affected the Chinese in the United States, Including the Chinese Exclusion Act, 112th Cong. (2012) (saved as ECF opinion attachment 4).

In striking down the line item veto, the Supreme Court articulated three factors for distinguishing a valid exercise of delegated discretion from an unconstitutional legislative amendment. Clinton , 524 U.S. at 443-44, 118 S.Ct. 2091. Statutory authority is more likely to be constitutional if one, Congress anticipates changing factual circumstances and delegates to the President the power to make adjustments when the anticipated change occurs; two, the President is required by statute to respond, in a specific way, to the changed circumstance, rather than having discretion to respond; and three, the President executes Congress's policy as opposed to making his own policy judgment. Id. But, under § 1182(f) and § 1185(a)(1), the President need not identify a specific factual scenario, need not act upon the occurrence of a specific circumstance, and has discretion to set his own policy by choosing his own solution. All three considerations therefore raise separation-of-powers concerns here.

Dulles interpreted the 1952 version of § 1185(a), which authorized the imposition of additional restrictions and prohibitions on travel during war or national emergency when the President "shall find that the interests of the United States" required it. Section 1185(b) authorized passport requirements upon proclamation by the President. 357 U.S. at 122 n.4, 78 S.Ct. 1113.

President Carter, unlike other Presidents, did not specifically invoke § 1182(f) ; instead, he invoked the 1952 version of § 1185(a). I nonetheless address his order here because it is conceptually similar and could be read as invoking the Immigration and Nationality Act generally and inclusively. Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (Nov. 26, 1979) (designating Secretary of State and Attorney General to prescribe limitations and exceptions on "Iranians holding nonimmigrant visas"); Additional Requirements in the Case of Certain Nonimmigrant Aliens, 45 Fed. Reg. 24,436 (Apr. 9, 1980) (invalidating all immigrant and nonimmigrant Iranian visas unless endorsed by consular officer); Requirements for Extension of Nonimmigrant Stay, Adjustment of Status to Lawful, Permanent Resident Status, and Change of Nonimmigrant Classification for Nonimmigrants from Iran, 45 Fed. Reg. 26,015 (Apr. 16, 1980) (imposing additional restrictions on Iranians with nonimmigrant visas in the United States, but allowing exceptions for close relationships, immediate medical treatment, and asylum); U.S. Immigration Policy Regarding Iranian Nationals: Hearing Before the Subcomm. on Immigration, Refugees, and Int'l Law of the H. Comm. on the Judiciary , 96th Cong. 28 (Apr. 17, 1980) (hereinafter "Iranian Nationals Hearing") (testimony of Elizabeth J. Harper, Deputy Assistant for Visa Services) (stating that agency has interpreted President's instructions to require issuance or endorsement of visas for Iranians with close family relationships to Americans).

As the Supreme Court has held, the existence of an exigency is a "judicial question" to the extent that the executive may be exceeding that constraint on his authority. See Sterling v. Constantin , 287 U.S. 378, 400-01, 403-04, 53 S.Ct. 190, 77 L.Ed. 375 (1932) ("It does not follow from the fact that the executive has [a given] range of discretion [during an exigency], deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat."). In Sterling , the Court affirmed the district court's grant of an injunction against the Texas governor after he declared martial law in the absence of any discernible emergency. Id.

Unlike § 1182(f), § 1185(a) does not even go so far as to authorize the denial of entry to "class[es] of aliens." Compare § 1182(f)with § 1185(a). By referring to "any alien," § 1185(a) does not clearly authorize categorical restrictions based on nationality. Even if a "class" of aliens under § 1182(f) could be read to encompass a whole nation's citizens, "any alien" under § 1185(a) certainly cannot be.

Restrictions on travel infringe upon liberty interests of those present in the United States, including noncitizens. See, e.g. , Landon v. Plasencia , 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ; Mathews v. Diaz , 426 U.S. 67, 77, 81-82, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment ... protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." (citations omitted) ); Demore v. Kim , 538 U.S. 510, 543, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) ; Kwong Hai Chew v. Colding , 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953).

Br. for the Cato Institute as Amicus Curiae at 16-21. As a result, inadequacies in information sharing, electronic passports, and the like are not rare scenarios that the executive has never encountered or has addressed via nationality-based entry restrictions. Cf. Haig v. Agee , 453 U.S. 280, 303, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (holding that absence of historical practice does not preclude executive from exercising power in new or novel scenarios).

Historically, the 1978 version of § 1185(a)(1) has never been invoked as the sole statutory basis for enacting an entry ban; it has been invoked only in conjunction with § 1182(f). See Manuel, supra . Indeed, § 1185(a)(1) provides auxiliary power for the administrative implementation of requirements created or authorized under another statutory provision.

Congress overhauled our nation's immigration laws, not only to remove racist quotas, but to make "[f]amily unity ... the first and foremost objective of the new system." 111 Cong. Rec. 21,585 (1965) (statement of Rep. Feighan). Congress expressly acted to ensure "that the family unit may be preserved as much as possible" under our immigration laws. H.R. Rep. No. 89-745, at 12 (1965); see 8 U.S.C. § 1151(b). Since Congress enacted a preference for family unity, no other President has ever imposed restrictions on the basis of nationality without exempting family members of Americans. Indeed, family reunification has remained a top priority even when national security is at stake. When President Carter restricted the entry of Iranian nationals because he suspected that the Iranian government planned to sneak its agents into the United States through our immigration system, he nonetheless exempted family members of Americans. See Iranian Nationals Hearing , supra note 20, at 3 (testimony of Barbara M. Watson, Assistant Secretary of State for Consular Affairs); id. at 8 (statement of David Crosland, Acting Commissioner of Immigration and Naturalization Service); id. at 28 (testimony of Elizabeth J. Harper, Deputy Assistant for Visa Services); 45 Fed. Reg. at 26,015. The same was true when President Reagan retaliated against Cuba for breaching an immigration agreement. 51 Fed. Reg. at 30,470.

Despite repeatedly characterizing the Proclamation as a sanction during oral argument, the Government cannot escape Congress's plenary power over commerce. Just as the classification of foreign nationals have required legislation, so too have sanctions that restrict the movement of people and goods. See, e.g. , 22 U.S.C. §§ 2798, 6005, 8512 ; 50 U.S.C. §§ 1701, 1702, 1707. As with Congress's comprehensive immigration scheme, there exists a detailed framework for imposing sanctions that affect commerce.

It is particularly appropriate to review the Proclamation's specific restrictions given the Proclamation's severability clause, to which courts should give effect if possible. 82 Fed. Reg. at 45,171.

Indeed, the Proclamation concludes that at least three of the banned countries are "important and valuable counterterrorism partner[s]." 82 Fed. Reg. at 45,165 -66 (referring to Chad, Libya, and Yemen).

For the reasons stated in the Majority Opinion, ante 269-72, I conclude that the three remaining Winter factors favor the entry of a preliminary injunction. Winter v. Nat. Res. Def. Council, Inc. , 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). Even absent First Amendment injury, family separation alone causes irreparable harm, and the balance of equities and the public interest continue to tip in Plaintiffs' favor.